# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## PEOPLE v GAFKEN

Docket No. 161835. Argued on application for leave to appeal October 13, 2022. Decided December 29, 2022.

Theresa M. Gafken was convicted following a jury trial in the St. Clair Circuit Court of second-degree murder, MCL 750.317. Defendant drove her vehicle at speeds exceeding 100 miles per hour while fleeing the police; she ran a red light and collided with other vehicles, killing one person and severely injuring several others. Defendant was originally charged with one count of second-degree murder and two counts of operating a vehicle while intoxicated (OWI), MCL 257.625(5)(a). Before trial, defendant moved to be allowed to testify that she intended to pull over when the police officer activated his overhead lights and that she did not do so because the passenger sitting behind her, Michael Scandalito, thrust a gun into her ribs and threatened to kill her if she stopped the car. In addition, defendant wanted to testify that Scandalito was on parole and being sought for a parole violation and that he had committed aggravated assault against his mother while using drugs. The prosecution opposed the motion, arguing that defendant should not be allowed to introduce the evidence because it amounted to a duress defense, which was not allowed. The court, Michael L. West, J., granted in part and denied in part the motion, concluding that the evidence was not admissible with regard to the second-degree-murder charge but was admissible with regard to the OWI charges. Following that ruling, the prosecution dismissed the two OWI charges, after which defendant moved to allow a duress defense. The court denied the motion, and the jury ultimately convicted defendant of second-degree murder. Defendant appealed. In an unpublished per curiam opinion issued on June 18, 2020 (Docket No. 345954), the Court of Appeals, MURRAY, C.J., and JANSEN and MARKEY, JJ., affirmed defendant's conviction and sentence. Defendant sought leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on whether to grant the application or take other action. 508 Mich 961 (2021).

In an opinion by Justice MCCORMACK, joined by Justices BERNSTEIN, CAVANAGH, and WELCH, the Supreme Court, in lieu of granting leave to appeal, *held*:

A defendant charged with second-degree murder under a depraved-heart theory has a right to raise the affirmative defense of duress. The elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. Malice may be established in three ways: by showing (1) the intent to kill, (2) the intent to cause

great bodily harm, or (3) the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. Murder proved using the third way of showing malice is commonly referred to as depraved-heart murder. A defendant is constitutionally guaranteed the right to a meaningful opportunity to present a complete defense, and duress is a common-law affirmative defense. The defense of duress does not negate any offense element but, rather, excuses the offense. The rationale of the defense of duress is that, for reasons of social policy, it is better that a person, faced with a choice of evils, choose to do the lesser evil (violate the criminal law) in order to avoid a greater evil threatened by another person. Historically, duress was not permitted as an affirmative defense to murder. However, *People v Reichard*, 505 Mich 81 (2020), held that duress may be asserted as an affirmative defense to a charge of felony murder if it is a defense to the underlying felony; the historical rationale that a person should die themselves rather than murder an innocent person does not apply to felony murder because the individual in the felony-murder context faces a choice between whether to spare their own life or aid in a lesser felony (that is, one that does not include as an element the killing of an innocent person). The historical rationale is also absent when depraved-heart murder is charged because depraved-heart murder does not present the choice between sparing one's own life or taking the life of an innocent; rather, the choice presented is to lose one's life or commit a lesser felony than intentional murder. In this case, the prosecution charged defendant only under a depraved-heart theory of murder. Because defendant alleged that she chose to do the lesser evil—drive recklessly—the duress defense was available. The trial court's order preventing defendant from raising a duress defense to a second-degree murder charge that relied on a depraved-heart theory of malice was error, and it was not harmless. The denial of the defense, coupled with the trial court's exclusion of any evidence that Scandalito threatened defendant, effectively left defendant with no defense at all.

Court of Appeals judgment reversed; defendant's conviction vacated; and case remanded to the St. Clair Circuit Court.

Justice WELCH, joined by Justice BERNSTEIN, concurring, agreed with the majority that duress is available as a common-law defense to second-degree murder when the accused is charged and prosecuted under the depraved-heart theory of malice; however, she wrote separately for two reasons. First, Justice WELCH believed it was important to acknowledge that Michigan's Constitution gives the Michigan Supreme Court the final say as to the common law of Michigan regardless of the choices made by other jurisdictions. Recent scholarship has challenged longstanding assumptions about the historical scope of the common-law duress defense in English courts. Moreover, Michigan courts have no obligation to adopt all aspects of English common law. Second, Justice WELCH wrote separately to draw attention to the fact that several questions about the scope and contours of the duress defense as applied to depraved-heart murder were left unresolved by the majority opinion, including who bears the burdens of proof and persuasion. Also left unanswered was whether duress is a complete defense to an unintentional homicide or whether it merely mitigates what would be second-degree murder down to manslaughter. The Michigan Supreme Court will eventually need to provide answers to these questions if the Legislature does not.

Chief Justice CLEMENT, dissenting, would have held that duress is not a defense to depraved-heart murder and that because defendant waived the defense of duress in the trial court, that issue should not have been addressed. Chief Justice CLEMENT disputed whether the choice to

act with the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result, as depraved-heart murder requires, was meaningfully different than a choice of taking the life of an innocent person. The common law, as adopted by the Legislature, does not recognize a meaningful distinction between these forms of malice. Keeping all other circumstances the same, a defendant with the intent to kill and a defendant with the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result will be found guilty of the same crime: second-degree murder. That each form of malice results in second-degree murder reflects a moral and legal judgment that the wanton and willful disregard of the risk of death or of great bodily harm is just as depraved as the intent to kill or the intent to cause great bodily harm. The majority incorrectly characterized depraved-heart murder as a "lesser felony" than intent-to-kill murder because they are the same felony of second-degree murder, only brought under alternative theories of malice. Chief Justice CLEMENT would not have differentiated among the theories of malice regarding the availability of the duress defense as the majority did. Instead, she would have concluded that, just as Michigan common law imposes the moral standard that a threatened person cannot take a life to save their own, the same threatened person cannot act in a way that is nearly certain to cause death or great bodily injury to save their own life.

Justice ZAHRA, joined by Justice VIVIANO, dissenting, emphasized that the long-established principle that duress is not a defense to murder means that no forms of killing with malice can or should be excused on the basis of duress. The majority rested its case on loose language from scattered sources that duress is not a defense to "intentional murder"; these cases at no point mentioned or discussed depraved-heart murder. The majority relied on the lack of more extensive caselaw to support its position, but this lack of caselaw may demonstrate that few serious jurists believed that a defendant could be acquitted of depraved-heart murder because of duress. Regarding *Reichard*, it was incongruous, at best, to apply logic underlying the Court's rejection of felony murder as a common-law crime in toto to create a duress defense for a long-established form of common-law murder—even more so when the primary case cited in favor of that defense explicitly rejected it. All common-law murders are intentional. They all involve an intentional act and either the intent to kill or the legal and moral equivalent to an intent to kill. For centuries, Michigan law has recognized that there is no legal, social, or moral reason to treat differently individuals who kill with the intent to cause death and those individuals who kill with the intentional disregard for human life. The consequences of the majority's decision will be that murder defendants will have a strong incentive to describe their actions in terms of a conscious disregard for death rather than an intent to kill; that difference could decide whether a defendant is found guilty or acquitted, whereas before today's decision the difference between those two forms of intent in a second-degree murder prosecution was largely one of semantics. The majority opinion will likely result in a sea change in the use of duress for homicide prosecutions. Finally, defendant expressly waived the defense of duress in the trial court when she conceded that duress is not a defense to depraved-heart murder; accordingly, defendant relinquished her right to such a defense, and appellate review—let alone reversal—was inappropriate.

Justice VIVIANO, joined by Justice ZAHRA, dissenting, would have held that duress is inapplicable to second-degree depraved-heart murder and that the Court should not have decided this issue at all because defendant waived the issue. The Court made an imprudent mistake when it ordered argument on the duress defense because defendant repeatedly conceded the issue in both lower-court hearings and in several documents, including defendant's briefing in the Court of

Appeals and application for leave to appeal in the Supreme Court. The majority's conclusion that the duress defense applies to depraved-heart murder hinged on the premise that the duress defense is inapplicable only to intentional murders and that because depraved-heart murder is not an intentional murder, the duress defense applies; this premise was incorrect and was based on loose dicta that did not reflect any actual holding by any court. Depraved-heart murder is not an intentional homicide in the traditional sense—it is not one in which the defendant actually intends to kill. The majority used this lack of intent to kill—as well as misread the treatises cited in *Reichard* and a few other cases—to distinguish depraved-heart murder from other types of murder for purposes of the duress defense. None of the cases and sources the majority cited for support even discussed or analyzed the matter, let alone decided whether duress applied to unintentional murders. The courts that have addressed this issue disagree with the majority. Furthermore, there was no persuasive rationale for recognizing duress as a defense to unintentional murders. The malice necessary for depraved-heart murder—an implied malice arising from an actor's disregard for the high risk of death posed by the actor's conduct—has long been viewed as equivalent to an express malice consisting of an intent to kill. Malice is a holistic concept that, although it can be classed as express or implied, is not subject to division into different degrees of culpability based on whether the killing was intentional or unintentional. The presence of malice precludes any legal excuse, including duress. Additionally, the inclusion of unintentional killings in the category of murder reflects common moral intuitions and helps explain why depraved-heart murder is distinct from felony murder in respect to the duress defense. Finally, the majority's argument that depraved-heart murder only creates a probability of killing an innocent as opposed to presenting a defendant with a choice to kill or be killed—in other words, that creating the risk of death is less blameworthy than intending to cause death—was flawed; the flaw in this argument was its underlying assumption that depraved-heart murder is materially distinct from intentional murder because the underlying conduct involves only the *risk* of death, whereas (presumably) the intentional murder presents the *certainty* of death. Even the intentional-murder scenario is unavoidably probabilistic. The rule that duress is inapplicable to attempted murder demonstrates that the defense is inapplicable even when there is the mere risk of death, which is precisely the situation with depraved-heart murder. Under the majority's approach, defendants can invoke the duress defense when their conduct creates a very high risk of death even though they were threatened only with serious bodily harm; defendants thus can choose what seems to be the greater evil and nonetheless invoke the defense.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch

FILED  December 29, 2022

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                          No. 161835

THERESA MARIE GAFKEN,

        Defendant-Appellant.

BEFORE THE ENTIRE BENCH

MCCORMACK, J.

Two terms ago, in *People v Reichard*, 505 Mich 81; 949 NW2d 64 (2020), this Court unanimously held that duress may be asserted as an affirmative defense to felony murder if it is a defense to the underlying felony. This case asks whether *Reichard*'s rationale extends to allowing duress to be asserted as an affirmative defense to what is known as depraved-heart second-degree murder. It does. We also conclude that the error in denying

the defense was not harmless, so we reverse the judgment of the Court of Appeals and remand this case to the St. Clair Circuit Court for further proceedings.[1]

## I. FACTS AND PROCEDURAL HISTORY

In April 2018, while fleeing from police, Theresa Gafken ran a red light at speeds topping 100 miles per hour and collided with other vehicles, killing one person and causing severe injuries to several others; Gafken was also injured. The prosecution charged her with second-degree murder, MCL 750.317, and two counts of operating a vehicle while intoxicated (OWI) causing serious impairment of a body function, MCL 257.625(5)(a). Before trial, Gafken moved to allow certain testimony. Specifically, she asked to be allowed to testify that she intended to pull over when the police officer activated his overheard lights and that she didn't do so because Michael Scandalito, who was sitting behind her, then thrust a gun into her ribs and threatened to kill her if she stopped the car. She also wanted to testify that Scandalito was on parole and being sought for a parole-violation warrant and had committed aggravated assault against his mother while in a methamphetamine rage. The prosecution opposed the motion, arguing that Gafken could not assert a duress defense to murder and should not be allowed to introduce this evidence.

The trial court granted in part and denied in part the motion. The court held that the evidence was not admissible on the homicide count but was admissible on the counts of OWI causing serious impairment of a body function. The prosecution then dismissed the two counts of OWI causing serious impairment of a body function.

---

[1] In light of our holding, we decline to address the defendant's argument about the jury instruction on malice, Issue 2 in our order granting oral argument on the application. See *People v Gafken*, 508 Mich 961, 962 (2021).

2

Gafken then moved to allow a duress defense. Following arguments, the trial court denied her motion.

The jury convicted Gafken of second-degree murder. The Court of Appeals affirmed her conviction and sentence in an unpublished opinion. *People v Gafken*, unpublished per curiam opinion of the Court of Appeals, issued June 18, 2020 (Docket No. 345954). After directing the prosecutor to respond to Gafken's application, *People v Gafken*, 955 NW2d 900 (2021), we ordered oral argument on the application and asked the parties to file supplemental briefs addressing these issues:

> (1) whether the trial court erred in excluding evidence that the defendant was threatened and of the defendant's mental state at the time of the offense; (2) whether the trial court erred in its instruction to the jury as to the intent element of second-degree murder; and (3) whether any error was harmless. [*People v Gafken*, 508 Mich 961, 962 (2021).]

## II. ANALYSIS

Whether a common-law affirmative defense is available for a statutory crime is a question of law that we review de novo. *Reichard*, 505 Mich at 85. This means that we review the issue independently, without deference to the lower court. *People v Jemison*, 505 Mich 352, 360; 952 NW2d 394 (2020).

"The elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998). Malice may be established in three ways: by showing (1) the intent to kill, (2) the intent to cause great bodily harm, or (3) the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. *Id*. at 464. Or, we also have held that the

3

third theory for proving malice can be shown by "the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result." *People v Dykhouse*, 418 Mich 488, 495; 345 NW2d 150 (1984). The prosecution charged Gafken only under the third theory of malice, commonly referred to as depraved-heart murder. See, e.g., *People v Aaron*, 409 Mich 672, 714; 299 NW2d 304 (1980).

"Duress is a common-law affirmative defense." *People v Lemons*, 454 Mich 234, 245; 562 NW2d 447 (1997). It does not negate any offense element but, rather, excuses the offense. *Id*. at 246 n 15. " 'The rationale of the defense of duress is that, for reasons of social policy, it is better that the defendant, faced with a choice of evils, choose to do the lesser evil (violate the criminal law) in order to avoid the greater evil threatened by the other person.' " *Id*., quoting 1 LaFave & Scott, Substantive Criminal Law, § 5.3, pp 614-615.

In *Reichard*, we explained that "[h]istorically, duress was not permitted as an affirmative defense to murder." *Reichard*, 505 Mich at 88. Quoting Lord Matthew Hale and William Blackstone, we identified why: " '[T]hough a man be violently assaulted, and hath no other possible means of escaping death, but by killing an innocent person; this fear and force shall not acquit him of murder; for he ought rather to die himself, than escape by the murder of an innocent.' " *Id*. at 92, quoting 4 Blackstone, Commentaries on the Laws of England, p *30, and citing 1 Hale, History of the Pleas of the Crown, p 51. But that rationale did not apply to felony murder because "felony murder does not present that choice. Instead, in the felony-murder context, the individual faces a choice between

4

whether to spare his or her own life or aid in a lesser felony (i.e., one that does not include as an element the killing of an innocent)." *Reichard*, 505 Mich at 92.

The rationale for the no-duress-defense-for-murder rule is just as absent when depraved-heart murder is charged. Depraved-heart murder does not present the choice between sparing one's own life or taking the life of an innocent. It is not kill or be killed. Rather, the choice presented here is like the choice in *Reichard*: lose one's life or commit a lesser felony than intentional murder (here, reckless driving and fleeing from law enforcement).

Although it has often been repeated that duress is not a defense to "homicide" or "murder," *Reichard*, 505 Mich at 89 n 18, we have recognized that this is an overly broad statement of the rule, *id*. at 90 n 18. Instead, the no-duress-defense-for-murder rule has been limited to cases of *intentional* murder historically. See, e.g., 2 LaFave, Substantive Criminal Law (3d ed), Duress, § 9.7(b), p 100 ("[D]uress is no defense to the intentional taking of life by the threatened person . . . ."); *Cole v State*, 221 So 3d 534, 543 n 4 (Fla, 2017) (stating that " 'duress is not a defense to intentional homicide' "), quoting *Henry v State*, 613 So 2d 429, 432 n 6 (Fla, 1992); *Commonwealth v Vasquez*, 462 Mass 827, 835; 971 NE2d 783 (2012) ("The common law has steadfastly rejected duress as a defense to intentional murder."); *Tully v State*, 730 P2d 1206, 1210; 1986 OK CR 185 (Okla Crim App, 1986) (noting that "common law recognized early on that duress should have no application to the *intentional* taking of an innocent life by the threatened person").

To be sure, some authority from other jurisdictions sounds in a broad rule—that duress is not a defense to "murder" without qualification. See, e.g., *People v Anderson*, 28 Cal 4th 767, 780; 50 P3d 368 (2002) ("duress is not a defense to any form of murder");

5

40 Am Jur 2d, Homicide § 107, p 721 (it is "generally held" that duress is not a defense to murder and that "duress [does not] mitigate murder to manslaughter"). But generally, this authority involves interpretation of a statute providing under what terms a duress defense can be raised. *Anderson*, 28 Cal 4th at 773 (interpreting Cal Penal Code 26). Of course, a state legislature may dictate the terms in which the duress defense may be raised. Because our Legislature has not done so, we apply the common-law rule.

And we are aware of no court that has considered the issue of whether duress can be raised as a defense to an unintentional homicide. Where courts have examined related questions (although in dictum), they have recognized that duress is at least *relevant* when the killing under duress isn't intentional. See *Anderson*, 28 Cal 4th at 779-780 ("Although duress is not an affirmative defense to murder, the circumstances of duress would certainly be relevant to whether the evidence establishes the elements of implied malice murder."); *id*. at 795 (Kennard, J., concurring in part and dissenting in part) ("The majority's discussion appears to assume that murder necessarily involves a *choice* to take an innocent life. Second degree murder, however, does not require an intent to kill."). Indeed, the concurrence/dissent in *Anderson* set forth a hypothetical with similar facts to those alleged by Gafken here:

> Imagine, for example, this scenario: Two armed robbers fleeing the scene of a store robbery force their way into a car that is leaving the parking lot. One robber holds a gun to the driver's head, while the other places a gun against the head of the driver's wife. They order the driver to take off at high speed and not to stop or slow down for stop signs or signal lights, threatening immediate death to the driver and his wife. If the driver complies, and an accident ensues resulting in the death of an innocent person, the driver could be prosecuted for second degree murder on an implied malice theory, and, under the majority's construction of section 26, the driver could not assert

6

duress as a defense. I doubt that our Legislature intended to withhold the defense of duress under these or similar circumstances. [*Id.*]

Understanding the foundation of the no-duress-defense-for-murder rule, we believe that Hale and Blackstone would not have intended to withhold the duress defense on these facts. Because Gafken alleges that she chose to do the lesser evil, a duress defense is available. See *Lemons*, 454 Mich at 246.

The prosecution doesn't offer many arguments to the contrary. Instead, it argues that this Court should not allow a duress defense for depraved-heart murder because the facts will make it very difficult for Gafken to succeed under a duress defense. But that argument confuses whether the law permits a duress defense (our job) with whether the defendant will be able to prevail on such a defense before a jury (not our job). A jury may agree with the prosecution—Gafken has a right to find out.[2]

A defendant is constitutionally guaranteed the right to a "meaningful opportunity to present a complete defense." *Crane v Kentucky*, 476 US 683, 690; 106 S Ct 2142; 90 L Ed 2d 636 (2012) (quotation marks and citation omitted). The trial court's order preventing Gafken from raising a duress defense to a second-degree murder charge that relied on a depraved-heart theory of malice was error, and it was not harmless. The denial of the defense, coupled with the trial court's exclusion of any evidence that Scandalito threatened Gafken, effectively left Gafken with no defense at all. The jury heard Gafken concede that she engaged in the conduct leading to the victim's death but was never able to consider

---

[2] If we extend the duress defense to depraved-heart murder, as we have, the prosecution and amicus Prosecuting Attorneys Association of Michigan encourage us to place the burden of persuasion on Gafken to establish the defense by a preponderance of the evidence. We decline to address the burden issue because it was not included in our order granting oral argument on the application.

whether "the law excused [her] conduct . . . ." *People v Leffew*, 508 Mich 625, 656; 975 NW2d 896 (2022). Because the prosecution has not shown that this preserved constitutional error was harmless beyond a reasonable doubt, we reverse. *People v Sammons*, 505 Mich 31, 56; 949 NW2d 36 (2020).

## III. CONCLUSION

A defendant charged with second-degree murder under a depraved-heart theory has a right to raise the affirmative defense of duress. The defendant in this case was denied her right to do so, and the error was not harmless. We therefore reverse the Court of Appeals judgment, vacate Gafken's conviction, and remand to the St. Clair Circuit Court for further proceedings consistent with this opinion.

Bridget M. McCormack
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch

8

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                     No. 161835

THERESA MARIE GAFKEN,

      Defendant-Appellant.

_____

WELCH, J. (*concurring*).

I agree with the majority that duress is available as a common law defense to second-degree murder when the accused is charged and prosecuted under the depraved heart theory of malice. I write separately for two reasons. First, I believe it is important to acknowledge that Michigan's Constitution gives this Court the final say as to the *common law of Michigan*, now and into the future, regardless of the choices made by other jurisdictions. Moreover, recent scholarship challenges longstanding assumptions about the historical scope of the common law duress defense in English courts. Secondly, although I agree with the decision to recognize duress as a common law defense to *unintentional* second-degree murder, the Court has left unresolved several questions about the scope and contours of the defense. Whether a successful duress defense excuses all criminal liability for an *unintentional* killing (such as depraved heart murder) is an open question. In short, courts will continue to grapple with the obvious tension between the death of an innocent bystander and allegations that the actions causing the death were the result of duress. And, of course, the Legislature can address the scope of the duress defense if it so chooses.

## I. COMMON LAW DURESS HAS A COMPLICATED HISTORY THAT DOES NOT BIND THIS COURT

This Court has the constitutional authority and prerogative to provide the final say on what the common law is in *Michigan*. See *Placek v Sterling Hts*, 405 Mich 638, 656; 275 NW2d 511 (1979) ("There is no question that both this Court and the Legislature have the constitutional power to change the common law.").[1] This Court has also recognized that "in exercising our common-law authority, our role is not simply to 'count heads' but to determine which common-law rules best serve the interests of Michigan citizens." *Stitt v Holland Abundant Life Fellowship*, 462 Mich 591, 607; 614 NW2d 88 (2000). It is also well established that Michigan courts do not have an obligation to adopt all aspects of English common law. See *Perrin v Lepper*, 34 Mich 292, 295 (1876) (" 'The common law of England is not to be taken, in all respects, to be that of America. Our ancestors brought with them its general principles and claimed it as their birthright; but they brought with them and adopted only that portion which was applicable to their situation.'—*Story, J.,* in *Van Ness v. Pacard, 2 Pet., 144*[.]"). Today's decision also is not the first time that this Court has changed the course of Michigan common law in a significant way. See, e.g., *Placek*, 405 Mich at 650 ("We hold, in the interest of justice for all litigants in this state, that the doctrine of comparative negligence hereby replaces the doctrine of contributory

---

[1] See also Const 1963, art 3, § 7 ("The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed."); Const 1963, art 6, § 1 ("[T]he judicial power of the state is vested exclusively in one court of justice which shall be divided into one supreme court, one court of appeals, [and] one trial court of general jurisdiction . . . ."). This Court has interpreted Const 1963, art 3, § 7 as authorizing "both judicial change and legislative amendment or repeal." *Placek*, 405 Mich at 657, citing *Myers v Genesee Co Auditor*, 375 Mich 1, 7; 133 NW2d 190 (1965).

negligence and that the standards of comparative negligence are to be applied by the court on remand for new trial in the instant case and on a limited retroactive basis.").[2]

Asking whether duress can serve as a defense to homicide is a deceptively complex question. Historically, many American common law courts have held that duress is not a defense to homicide, at least when the killing was intentional. See, e.g., *State v Nargashian*, 26 RI 299, 301-304; 58 A 953 (1904) (holding that the trial court properly

---

[2] I do not read the dissents as contesting this Court's authority to define or change Michigan's common law. Rather, the dissents appear to be better understood as objecting to the new common law path on which the majority has chosen to embark and as raising concerns about the depth of the majority's analysis. Further, I disagree with the dissents' assertion that the duress-defense issue was waived by defendant, Theresa M. Gafken. Justice VIVIANO argues that defendant waived the duress defense in the Court of Appeals. Justice ZAHRA argues that defendant waived the duress defense in the trial court. Defendant filed numerous pretrial motions concerning these issues. To the extent Justice VIVIANO argues that this issue was waived or abandoned in the Court of Appeals, defendant's appellate attorney argued the following in the brief filed with the Court of Appeals: "In the present case, the precluded evidence was not a means of claiming that Ms. Gafken was innocent of homicide. That would clearly be prohibited by law. The only issue at trial was whether Gafken was guilty of second-degree murder or involuntary manslaughter." (Emphasis omitted.) Appellate counsel's focus on duress to negate malice and the concession that allowing a common law duress defense to homicide was prohibited by then-existing precedent may have been a tactical decision given the state of the law. But it would be an unjust mistake for this Court to read appellate counsel's argument as waiving defendant's ability to present defendant's previously raised argument that the common law duress defense to depraved heart murder *should* be permitted. As the majority acknowledges, a defendant is entitled to a " 'meaningful opportunity to present a complete defense.' " Quoting *Crane v Kentucky*, 476 US 683, 690; 106 S Ct 2142; 90 L Ed 2d 636 (2012). This Court has also repeatedly recognized that even when an issue is not preserved, "this Court has inherent power to review an issue not raised in the trial court to prevent a miscarriage of justice[.]" *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008). Given this Court's conclusion that the common law duress defense is permitted when defending against allegations of depraved heart murder, it would be unjust for this Court to ignore defendant's preserved issue merely because of a few sentences of her appellate attorney's argument in the Court of Appeals. Because the trial court did not permit defendant to present a duress defense to the jury, it would be inappropriate for this Court to opine on whether defendant can successfully assert the defense on remand.

rejected a duress jury instruction for an accomplice to an intentional killing).  This Court has previously recognized the historical basis for this American jurisprudential view to be grounded, at least in part, in ancient treatises authored by Sir Matthew Hale and Sir William Blackstone.  See *People v Reichard*, 505 Mich 81, 88-89; 949 NW2d 64 (2020).  Some jurists who have looked at these legal texts have assumed or argued that, at least from a historical perspective, duress cannot be a defense to any killing committed with malice.

In his dissent, Justice VIVIANO argues that there is not historical support for the path the Court has taken today.  For example, the dissent cites 1 Hale, History of the Pleas of the Crown, p 51, and argues that

> [s]ome of the older sources note that duress was also inapplicable to other crimes not involving killing at all, including treason and robbery.  From this, it would appear that the more prevalent and longer-established version of the rule is the broader one [i.e., that duress is unavailable as a defense to all homicides].  [*Post* at 13-14.]

This might be a fairer critique if it was unquestionably true.  But history—and the law—can be shaped by one idea or viewpoint while ignoring others that existed at the time.  Many legal scholars writing on the subject of duress as a defense focused their attention on the development of criminal law *after* Hale and Blackstone penned their seminal treatises.  Hale and Blackstone have been bestowed with a sage-like quality in American jurisprudence as irrefutable sources of authority regarding English common law.  Judges, advocates, and scholars have been hesitant to question the premise of the legal assertions penned by these jurists centuries ago.  But recent scholarship raises questions about many of these historical common law assumptions.  See Elkington, *The Historical Development of Duress and the Unfounded Result of Denying Duress as a Defence to*

4

*Murder* (Online First publication), J Crim L (2022), available at <https://journals.sagepub.com/doi/10.1177/00220183221093993> [Click "PDF / ePub"] (accessed December 5, 2022).  Elkington examined "all reported duress cases and the Statutes of the Realm, which significantly impacted on the development of the law, from 1266 (the first found recorded use of duress) until the end of the 19th century with the landmark case of *Dudley and Stephens*."  *Id*. at 2 (citation omitted).  She argues that at its conception, "duress was created as a full defence for treason, including where the defendant had killed," and concludes that "the decision to deny use of the [duress] defence in [*R v Howe*, (1987) AC 417 (appeal taken from Court of Appeal, Criminal Division)] cannot be substantiated by reference to the defence's historical development."  *Id*.  For example, Elkington notes the following:

> Many of the initial cases where duress was used were where the defendant had been involved in some form of civil war or rebellion.  In Henry III Statutes of the Realm 1266–67 the excuse of duress was used to mitigate the punishments of those who had committed treason by assisting rebels in the battle of Evesham.  The ordinary punishment for bailiffs and officers of the Earl of Leicester who had committed treason through actions amounting to robbery and manslaughter, was a fine of as much as their lands were worth for five years, but the punishment for those who acted through fear had the lesser punishment of one year's value of their land.  This early reference to duress sets no limits on what type of offence duress would act to mitigate, although it is an early indication that acting under duress could be used to mitigate the punishment for manslaughter in treason cases. [*Id*. at 3 (citations omitted).]

These observations are directly contrary to the assertion that there is little historical basis for duress serving as a defense to crimes of treason or homicide.

Elkington further noted that peacetime English courts eventually rejected duress as a defense to murder in 1838 in the case of *R v Tyler*,[3] *id*. at 7, but she questions the historical and doctrinal basis for this change in course considering prior precedent, *id*. Of course, Elkington's work, standing alone, is unlikely to resolve hundreds of years of debate among legal scholars.[4] But her research suggests that at least some of the assumptions made by American courts about English common law are premised on an inaccurate—or at least incomplete—account of the historical record. Perhaps Hale and Blackstone did not have all the relevant information or perhaps they chose one historical narrative given the preferred public opinion, moral narrative, or political climate of the times. Elkington observes that by the time Hale was writing in the eighteenth century, he "made the point that the law is different in times of war to times of peace; stating that duress would not be a defence to treason, murder[,] or robbery in times of peace, but could be (a defence to treason) in times of war or rebellion." *Id*. at 5-6. She notes, however, that such an argument "seems . . . illogical if the threat was immediate and so no protection could be sought even in times of peace[.]" *Id*. at 6. It is entirely possible that rather than simply documenting verbatim previous legal determinations, Hale and Blackstone were doing what many

---

[3] *R v Tyler*, 173 Eng Rep 643; 8 C & P 616 (1838).

[4] Elkington is not the first scholar to question or analyze the pragmatic and philosophical bases for prohibiting duress as a defense to murder. See, e.g., Mulroy, *The Duress Defense's Uncharted Terrain: Applying it to Murder, Felony Murder, and the Mentally Retarded Defendant*, 43 San Diego L Rev 159, 173-180 (2006) (advocating for a more flexible approach to the duress defense); Dressler, *Exegesis of the Law of Duress: Justifying the Excuse and Searching for its Proper Limits*, 62 Cal L Rev 1331, 1368-1375 (1989) (discussing line-drawing considerations for duress and the idea of coerced homicides).

advocates and legal scholars do today: making subtle arguments for what they thought the common law *should* be. And while learned legal scholars and their treatises provide beneficial context and background, the words of Hale and Blackstone do not dictate Michigan's common law today.

## II. THE COURT'S DECISION TODAY LEAVES MANY QUESTIONS UNANSWERED

The Court's decision today recognizes the existence of a duress defense for *unintentional* second-degree murder. Many questions remain. Some the Court has expressly declined to reach today, such as who bears the burdens of proof and persuasion as to the duress defense. Other questions also remain unanswered. One particularly thorny question is whether duress is a complete defense to an *unintentional* homicide, or whether it merely mitigates what would be second-degree murder down to manslaughter. This question warrants some illumination.

## A. STATE LAW STATUTORY AND COMMON LAW REGARDING THE DURESS DEFENSE IS NOT UNIFORM ACROSS THE COUNTRY

There is a lack of consensus among state jurisdictions as to whether and to what extent duress can excuse a homicide. Section 2.09 of the Model Penal Code provides that duress is a complete affirmative defense to *any crime* unless the "actor recklessly placed himself in a situation in which it was probable that he would be subject to duress" or if the actor does so negligently if negligence would be enough to "establish culpability for the offense charged." Model Penal Code, § 2.09(2) (1985). But model codes are not the law unless adopted, usually through the legislative process.

7

In terms of legislation, as the majority and dissenting opinions acknowledge, states have taken a variety of approaches toward the duress defense. Twelve states have enacted statutes that appear to mirror, if not explicitly adopt, § 2.09 of the Model Penal Code, including its carveout.[5] Nine additional states have adopted statutes that appear to allow duress as a complete or partial defense to one or more forms of nonintentional homicide.[6] Ten other states have enacted statutes that appear to foreclose the duress defense for all intentional or reckless killings, if not for all forms of homicide.[7] Concerning the latter two

---

[5] See Alaska Stat 11.81.440; Ark Code Ann 5-2-208; Conn Gen Stat 53a-14; Del Code Ann tit 11, § 431; Haw Rev Stat 702-231; NY Penal Law 40.00; ND Cent Code 12.1-05-10; 18 Pa Cons Stat 309; SD Codified Laws 22-5-1; Tenn Code Ann 39-11-504; Tex Penal Code Ann 8.05; Utah Code Ann 76-2-302.

[6] See Colo Rev Stat 18-1-708 (making duress available for all offenses other than "class 1" felonies, which includes some but not all forms of homicide); Idaho Code 18-201 (making the duress defense available for all offenses that are not "punishable with death"); Ky Rev Stat Ann 501.090 (allowing duress as a defense to all crimes except "intentional homicide"); Me Stat, tit 17-A, § 103-A (excluding homicides that are committed "intentionally or knowingly" from the duress defense); Minn Stat 609.08 and Minn Stat 609.20(3) (providing that a successful duress defense mitigates an intentional or unintentional killing to manslaughter in the first degree); Mont Code Ann 45-2-212 (making duress available as a defense to all crimes except those punishable by death, such as deliberate homicide under Mont Code Ann 45-5-102); NJ Stat Ann 2C:2-9(b) ("In a prosecution for murder, the [duress] defense is only available to reduce the degree of the crime to manslaughter."); Nev Rev Stat 194.010(8) (making duress available as a defense to all crimes except those punishable by death, such as first-degree murder); Wis Stat 939.46 (allowing a duress defense to most crimes, but "if the prosecution is for first-degree intentional homicide, the degree of the crime is reduced to 2nd-degree intentional homicide").

[7] See Ala Code 13A-3-30(d) (excluding all forms of murder and killings under aggravated circumstances from the duress defense); Ariz Rev Stat Ann 13-412 (defining duress as a justification defense, but excluding "offenses involving homicide or serious physical injury"); Ga Code Ann 16-3-26 (making duress available as a defense for all crimes except "murder"); Ind Code 35-41-3-8 (excluding from duress defense crimes "against the person as defined in" Ind Code 35-42, which includes all forms of homicide, battery, kidnapping, human trafficking, sex crimes, and robbery); Iowa Code 704-10 (allowing a duress defense

8

groups, nearly all state legislatures have adopted the carveout provision from the Model Penal Code that precludes the defense if the actors intentionally or recklessly put themselves in a position to be placed under duress. Declaring that someone *could potentially* be excused, in full or in part, for causing the death of another person to save their own life is an unenviable quagmire on many levels. The lack of uniformity among states that have taken legislative action illustrates that such line-drawing is fraught with difficulty.

In common law jurisdictions, the law is equally unsettled. No court appears to have resolved the precise question that was presented to this Court—whether the common law duress defense is available to refute allegations of unintentional homicide premised on a criminal recklessness theory of malice (also known as depraved heart murder in Michigan). With respect to the courts that have addressed duress in the context of homicide accusations, nearly every case involved an intentional killing, and to the extent that unintentional killings have been discussed, it has generally been in dicta.[8] For example, in

---

for all crimes except "an act by which one intentionally or recklessly causes physical injury to another"); Kan Stat Ann 21-5206 (allowing a duress defense for all crimes except murder or voluntary manslaughter); La Stat Ann 14:18 (defining duress as a justification defense but excluding "murder"); Mo Rev Stat 562.071 (making duress available for all crimes except "murder"); Or Rev Stat 161.270 (making duress available for all offenses other than "murder"); Wash Rev Code 9A.16.060(2) (making duress available as a defense for all crimes except "murder, manslaughter, or homicide by abuse").

[8] See, e.g., *Driggers v State*, 917 So 2d 329, 331 (Fla App, 2005) (in an appeal by the defendant who was charged with intentional second-degree murder but was convicted of voluntary manslaughter as a lesser included offense, the trial court observed that "[t]he courts generally agree that duress is not a defense to homicide"); *People v Serrano*, 286 Ill App 3d 485, 491; 676 NE2d 1011 (1997) (in an appeal arising from convictions of felony murder, the court noted that duress may be raised as a defense to felony murder but not to other forms of homicide); *Commonwealth v Vasquez*, 462 Mass 827, 835; 971 NE2d 783 (2012) (in an appeal from convictions of intentional first-degree murder, the court held,

*People v Anderson*, 28 Cal 4th 767, 780; 50 P3d 368 (2002), the California Supreme Court held that Cal Penal Code 26 did not create a statutory right to a duress defense and that at common law, "duress is not a defense to any form of murder." The court also rejected arguments that duress could reduce murder to manslaughter. However, *Anderson*, *id*. at 784, acknowledged, and the court reaffirmed in *People v Powell*, 6 Cal 5th 136, 164; 425 P3d 1006 (2018), that duress may be raised as a defense to felony murder if it is a defense to the underlying felony. Notably, *Anderson* was not a case concerning allegations of an

"we hereby reject duress as a defense to deliberately premeditated murder, murder committed with extreme atrocity or cruelty, and murder in the second degree"); *Johnson v State*, 290 So 3d 1232, 1242 (Miss, 2020) (in an appeal from a conviction of first-degree murder under an accomplice-liability theory, the court noted that "[l]ongstanding Mississippi law holds that duress is not a legal defense to murder") (quotation marks and citation omitted; alteration in original); *Long v State*, 74 P3d 105, 108; 2003 OK CR 14 (Okla Crim App, 2003) (in an appeal from a conviction of first-degree intentional murder, the court noted that "duress is not a defense to the intentional taking of an innocent life by a threatened person"); *State v Smarr*, 146 NC App 44, 54; 551 SE2d 881 (2001) (in an appeal from a conviction for intentional second-degree murder, the court noted that duress is not applicable to murder); *State v Finnell*, 101 NM 732, 737; 688 P2d 769 (1984) (in an appeal from a conviction for first-degree intentional murder, the court noted that duress is not a defense to homicide); *State v Fuller*, 203 Neb 233, 243; 278 NW2d 756 (1979) (in an appeal from a conviction of first-degree intentional murder, the court noted that "[d]uress or compulsion is no excuse to a charge of homicide"), rev'd in part on other grounds; rehearing denied, 204 Neb 196 (1979); *State v Nargashian*, 26 RI 299, 304; 58 A 953 (1904) (in an appeal from a conviction of intentional murder as an accomplice, the court held that "fear induced by one person is no defense to a defendant who kills another under its influence"); *Arnold v Commonwealth*, 37 Va App 781, 788; 560 SE2d 915 (2002) (in an appeal from a conviction of second-degree murder, the court acknowledged that duress is a defense to felony murder when the murder is committed by a co-actor but suggested that it is not available for other forms of murder); *State v Rocheville*, 310 SC 20, 26; 425 SE2d 32 (1993) (in an appeal from convictions of armed robbery, kidnapping, and murder, the court noted that duress is not a complete defense to intentional murder and that it also cannot mitigate the crime to voluntary manslaughter); *James v State*, 357 P3d 101, 106; 2015 WY 83 (2015) (in an appeal from a conviction for aiding and abetting a robbery, the court noted that "[i]n Wyoming, duress has been recognized as a defense to criminal charges, other than a charge of taking the life of an innocent person").

unintentional homicide.  Rather the homicide allegations in that case arose from a brutal group beating that eventually led to the victim being bludgeoned to death and disposed of in a ravine.  *Anderson*, 28 Cal 4th at 770-771.  Thus, any commentary in *Anderson* concerning the nonapplicability of the common law duress defense to an unintentional homicide was dicta.

## B.  THE POSSIBILITY OF AN IMPERFECT DEFENSE

The majority opinion today does not answer the question of whether duress is a *complete* defense to allegations of *unintentional* second-degree murder.  Some state legislatures have recognized duress as a mitigating defense.  See NJ Stat Ann 2C:2-9(b) ("In a prosecution for murder, the [duress] defense is only available to reduce the degree of the crime to manslaughter.").  The possibility of an imperfect or mitigating defense to homicide has also been discussed by leading scholars:

> One who is coerced by another person, or forced by the pressure of natural physical circumstances (e.g., thirst, starvation) into committing what is otherwise a crime, may have in some circumstances a complete defense to the crime, but not if the crime in question consists of intentionally killing another human being.  Thus one who, not in self-defense or defense of another, kills an innocent third person to save himself or to save another is guilty of a crime.  But it is arguable that his crime should be manslaughter rather than murder, on the theory that the pressure upon him, although not enough to justify his act, should serve at least to mitigate it to something less than murder.  Some of the latest state criminal codes so provide. [2 LaFave, Substantive Criminal Law (3d ed, 2018), § 15.3(c), p 705 (citations omitted).]

The Court of Special Appeals of Maryland followed the mitigation path outlined by LaFave in *Wentworth v State*, 29 Md App 110, 118; 349 A2d 421 (1975).  Wentworth was charged with second-degree murder as an accomplice to an intentional murder committed

11

by her husband. The issue the court considered was whether the defendant's charges could be reduced to voluntary manslaughter in light of strong evidence that the defendant had little choice or ability to escape from her husband during or after the killing. *Id*. at 112-113, 116. The *Wentworth* court recognized that "[w]hatever the psychological reality may be, the law, as a matter of social policy, has declared that the defense of duress may not extend to the taking of an innocent person's life." *Id*. at 118. Despite this, the court found compelling LaFave's & Scott's treatise (albeit an older edition) and other authorities, and it held that "an 'imperfect' defense of duress may not exculpate a defendant in an unlawful homicide case but may supply that mitigation necessary to lower the degree of guilt from murder to manslaughter[.]" *Id*. at 121. Similar logic might be applicable to depraved heart murder given that a death was not intentional but was a natural and probable consequence of the accused's reckless conduct.

Similarly, in the felony-murder context, this Court's decision in *Reichard* did not recognize duress as a complete defense to the killing. *Reichard*, 505 Mich at 88-89. Rather, the Court held that the prosecution could "proceed against the defendant on the lesser included offense of second-degree murder if the evidence supported that charge. In other words, the defendant's duress defense to the underlying felony would only prevent the enhancement of second-degree murder to first-degree murder." *Id*. at 95-96 (citation omitted). Under *Reichard*, a successful duress defense to accusations of felony murder does not excuse the accused from the risk of punishment for the crime if the conduct could be prosecuted as second-degree murder. Stated differently, a prosecution could move forward if there is evidence that a human death occurred, because of the actions of the

12

accused (or an accomplice), with malice, and without a proper justification or excuse. See *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998).

It is also worth noting that voluntary manslaughter in Michigan operates similarly to an imperfect defense. All the elements of intentional second-degree murder are present: (1) a death, (2) caused by the defendant's act, (3) with malice (under an intent to kill or intent to cause great bodily harm theory), and (4) without justification. But in contrast to second-degree murder based on a depraved heart theory of malice, a conviction of manslaughter is appropriate if the killing occurred "in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." *People v Mendoza*, 468 Mich 527, 535; 664 NW2d 685 (2003). Conversely, "[i]nvoluntary manslaughter is the unintentional killing of another, without malice, during the commission of an unlawful act not amounting to a felony and not naturally tending to cause great bodily harm; or during the commission of some lawful act, negligently performed; or in the negligent omission to perform a legal duty." *Id*. at 536. "[B]oth forms of manslaughter are necessarily included lesser offenses of murder. . . . Consequently, when a defendant is charged with murder, an instruction for voluntary and involuntary manslaughter must be given if supported by a rational view of the evidence." *Id*. at 541.

This, of course, logically leads to questions about the drawing of lines and whether there are limits to the scope of a duress defense when raised in the face of an innocent life having been lost. If a successful duress defense is raised to felony murder under *Reichard*—which, assuming the evidence exists, requires that first-degree murder charges be reduced to second-degree murder—does the same defense now apply to the

13

second-degree murder charge? If so, could those charges hold water? And what about the defendant in this case? If she is successful in her attempt to raise a duress defense on remand, could the jury still find her guilty of the lesser included offense of manslaughter? The Court need not answer these questions today, but such questions loom and will need to be considered.

## III. CONCLUSION

I join the majority today in recognizing that someone accused of *unintentional* second-degree murder (also known as depraved heart murder) can, in theory, raise a common law duress defense. But the Court's ruling today does not explicitly foreclose or endorse the possibility of being convicted of the lesser included offense of manslaughter after a successful duress defense has been asserted. Nor has the Court addressed who bears the burden of proof or persuasion for such a defense. In the absence of action from the Legislature, this Court will need to provide the answers.

Elizabeth M. Welch
Richard H. Bernstein

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

No. 161835

THERESA MARIE GAFKEN,

      Defendant-Appellant.

_____

CLEMENT, C.J. (*dissenting*).

I respectfully dissent from the majority's opinion recognizing duress as an affirmative defense to depraved-heart murder. Because I believe that the Court of Appeals reached the correct result below, I would instead affirm.

Duress is an affirmative defense which excuses a defendant's culpability for a crime under the theory that "it is better that the defendant, faced with a choice of evils, choose to do the lesser evil (violate the criminal law) in order to avoid the greater evil threatened by the other person." *People v Lemons*, 454 Mich 234, 246; 562 NW2d 447 (1997), quoting 1 LaFave & Scott, Substantive Criminal Law, § 5.3, pp 614-615 (quotation marks omitted). This defense is not without limitation: a defendant asserting duress as a defense must satisfy various requirements regarding the extent of the threat, the timeliness of the threat, and the reasonableness of the defendant's reaction. See *People v Luther*, 394 Mich 619, 623; 232 NW2d 184 (1975). Further, and most relevant to the issue at hand, defendants facing charges of murder have historically been prohibited from asserting a duress defense. See *People v Reichard*, 505 Mich 81, 88-89; 949 NW2d 64 (2020). Early common-law

commentators remarked that the logical premise underlying duress—that the law should encourage a threatened person to choose the lesser of two evils—should not be applied to the commission of murder, reasoning that a threatened individual "ought rather to die himself, than escape by the murder of an innocent." 4 Blackstone, Commentaries on the Laws of England, p *30. See also 1 Hale, History of the Pleas of the Crown, p 51 ("[I]f a man be desperately assaulted, and in peril of death, and cannot otherwise escape, unless to satisfy his assailant's fury he will kill an innocent person then present, the fear and actual force will not acquit him of the crime and punishment of murder, if he commit the fact; for he ought rather to die himself, than kill an innocent[.]").

Relying on this historical commentary, our Court of Appeals initially recognized a blanket prohibition of the duress defense as to all homicide crimes in *People v Dittis*, 157 Mich App 38, 40; 403 NW2d 94 (1987), overruled by *Reichard*, 505 Mich at 90 n 18. However, in so doing, the *Dittis* Court did not engage in a thorough analysis of the common-law restrictions on the duress defense; it instead summarily concluded that "[a]t common law duress is not a defense to homicide." *Dittis*, 157 Mich App at 40-41. Unexplained was whether the prohibition of duress applied to all homicide-related charges, only murder charges, or only certain types of murder charges. Subsequent caselaw cited *Dittis* for its broad prohibition, and that caselaw, too, failed to engage in a thorough review of this principle. See, e.g., *People v Henderson*, 306 Mich App 1, 5; 854 NW2d 234 (2014), overruled by *Reichard*, 505 Mich 81; *People v Gimotty*, 216 Mich App 254, 257; 549 NW2d 39 (1996), overruled by *Reichard*, 505 Mich 81; *People v Travis*, 182 Mich App 389, 392; 451 NW2d 641 (1990), overruled by *Reichard*, 505 Mich 81.

Recently, this Court examined the duress prohibition in *People v Reichard* and concluded that duress should be available to a defendant accused of first-degree felony murder. *Reichard*, 505 Mich at 83. To prove first-degree felony murder, a prosecutor must demonstrate that the defendant committed second-degree murder during the course of a felony enumerated in MCL 750.316(1)(b); essentially, the commission of the felony elevates what otherwise would have been a second-degree-murder charge to a first-degree-murder charge. See *People v Aaron*, 409 Mich 672, 734; 299 NW2d 304 (1980). In *Reichard*, this Court reflected on the historical justification for the duress prohibition—that a threatened person should choose death over the murder of an innocent person—and concluded that it did not apply with equal force to felony murder because the threatened person is not presented with that same choice. *Reichard*, 505 Mich at 92. "Instead, in the felony-murder context, the individual faces a choice between whether to spare his or her own life or aid in a lesser felony (i.e., one that does not include as an element the killing of an innocent)." *Id*. This Court further reasoned that prohibiting the use of duress as a defense to a felony-murder charge would be illogical where, had the second-degree murder and the felony been charged separately, the defendant would have been able to assert duress as a defense against the felony charge. *Id*. at 93. In sum, this Court concluded that duress is an available defense to first-degree felony murder because it can negate the enumerated felony that operates to elevate the murder from second degree to first degree. *Id*. at 95. Importantly, this Court did *not* conclude that duress would completely excuse the killing at hand, noting that a successful duress defense in the felony-murder context would still allow the prosecutor "to proceed against the defendant on the lesser included offense of second-degree murder if the evidence supported that charge." *Id*. at 95-96. In recognizing

3

that duress should be available in the context of felony murder, this Court also expressly overruled *Dittis* to the extent that it applied to crimes beyond the first-degree-murder charge at issue in *Dittis*. *Id*. at 90 n 18.

Today, the majority concludes that the rationale expressed in *Reichard* regarding felony murder is also applicable to depraved-heart murder.[1] Depraved-heart murder is a colloquial term for a second-degree-murder charge brought under a specific theory of malice. "The elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998). The prosecution may establish malice by proving that the defendant had one of three intents: "the intent to kill, the intent to inflict great bodily harm, or the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result." *People v Dykhouse*, 418 Mich 488, 495; 345 NW2d 150 (1984).[2] A second-degree-murder charge brought under this third and final theory of malice is what is known as depraved-heart murder. See *Aaron*, 409 Mich at 714.

The majority reasons that

[t]he rationale for the no-duress-defense-for-murder rule is just as absent when depraved-heart murder is charged. Depraved-heart murder does not

---

[1] I agree with my dissenting colleagues that defendant waived this issue below and that, accordingly, this Court should not have addressed it. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000).

[2] The third form has also been phrased as the "wanton and willful disregard of the likelihood that the natural tendency of a person's behavior is to cause death or great bodily harm." *Aaron*, 409 Mich at 728.

4

present the choice between sparing one's own life or taking the life of an innocent. It is not kill or be killed. Rather, the choice presented here is like the choice in *Reichard*: lose one's life or commit a lesser felony than intentional murder (here, reckless driving and fleeing from law enforcement).

\* \* \*

. . . Because Gafken alleges that she chose to do the lesser evil, a duress defense is available. See *Lemons*, 454 Mich at 246.

I disagree with this rationale. Specifically, I dispute whether the choice to act with "the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result," *Dykhouse*, 418 Mich at 495, as depraved-heart murder requires, is meaningfully different than a choice of "taking the life of an innocent." Certainly, our common law (as adopted by the Legislature) does not see a meaningful distinction between these forms of malice. Keeping all other circumstances the same, a defendant with the intent to kill and a defendant with the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result will be found guilty of the same crime: second-degree murder.[3] That each form of malice results in second-degree murder reflects a moral and legal judgment that the wanton and willful disregard of the risk of death or of great bodily harm is just as depraved as the intent to kill or the intent to cause great bodily harm. For example, a

---

[3] Of course, first-degree murder also requires a finding of malice. First-degree murder is typically distinguished from second-degree murder in that it also requires a showing of premeditation and deliberation. MCL 750.316(1). Accordingly, if the circumstances at hand include premeditation and deliberation, the defendant with the intent to kill and the defendant with the intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm will result will both be found guilty of first-degree murder.

5

defendant who, without premeditation or deliberation, shoots a firearm at a specific person in a mall intending to kill the victim is considered as depraved as the defendant who shoots a firearm into a crowd at the mall without the intent to kill but with the knowledge that doing so will very likely result in a person's death or great bodily harm, and both will be found guilty of the same crime. The majority is thus incorrect to characterize depraved-heart murder as a "lesser felony" than intent-to-kill murder because they are instead actually the *same felony* of second-degree murder, only brought under alternative theories of malice.[4]

A threatened person who has committed depraved-heart murder has engaged in the same prohibited choice described by Blackstone: to commit murder rather than lose one's own life. I would not differentiate among the theories of malice regarding the availability of the duress defense as the majority now does. Instead, I would conclude that, just as our common law imposes the moral standard that a threatened person cannot take a life to save their own, the same threatened person cannot act in a way that is nearly certain to cause death or great bodily injury to save their own life. The law has consistently treated these forms of malice the same, and I see no reason in either the majority opinion or the caselaw

---

[4] To the extent that the majority relies on *Reichard* for its conclusion, I would emphasize that in *Reichard*, this Court held only that duress was a defense to first-degree murder insofar as duress applied to the underlying felony; this Court did not hold that duress could excuse second-degree murder. *Reichard*, 505 Mich at 95-96. In fact, this Court explicitly explained that a successful duress defense as to a first-degree felony-murder charge would still allow the prosecution to pursue a second-degree-murder charge. *Id*.

it cites[5] to differentiate between these forms of malice such that duress should be prohibited for a murder charge brought under one theory of malice and not the other.[6] Therefore, I dissent.

Elizabeth T. Clement

---

[5] I agree with my dissenting colleagues that the caselaw the majority cites does not demonstrate that duress has historically been proscribed as a defense only when an intent-to-kill murder has been charged, nor does this caselaw demonstrate that duress is contemporarily proscribed as a defense against only intent-to-kill murder charges in most of our sister states.

[6] I would also note that the majority's new rule poses practical difficulties for future prosecutions. Even when a prosecutor proceeds under an intent-to-kill or intent-to-cause-great-bodily-injury theory of malice, a defendant could choose to argue that their intent instead reflected depraved-heart murder. Under this theory of the case, the duress defense would become available to the defendant. Accordingly, even when the prosecutor's theory of malice is "intentional," it is likely that the duress defense would be available to the defendant despite that all appear to agree that "intentional" killings are not subject to the duress defense. Although the jury in such a case could be instructed to consider the duress defense only as to the depraved-heart theory of malice, given the practical difficulty of proving a defendant's subjective intent to kill, the most likely conclusion is that the jury will prefer to assess a defendant's actions under the more easily proven depraved-heart theory of malice—which will also now allow consideration of a duress defense. In sum, duress defenses are likely to now become available in most second-degree-murder prosecutions. While this does not mean that every second-degree-murder defendant will have a *successful* duress defense, it does mean that the scope of the majority's new rule is broader than it appears at first glance.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                             No. 161835

THERESA MARIE GAFKEN,

       Defendant-Appellant.

_____

ZAHRA, J. (*dissenting*).

The majority opinion reverses a murder conviction on the basis of a duress defense

that defendant expressly waived at trial and failed to raise on appeal.[1]  More astounding

---

[1] When defendant, Theresa M. Gafken, initially sought to introduce evidence of Michael Scandalito's threat at the trial level, defendant conceded that duress is not a defense to depraved-heart murder.  In response to the prosecution's argument that defendant was attempting to introduce a duress defense, defendant recognized that while her case was not one "where the defense of duress can be asserted," she claimed the evidence could nonetheless negate "the requisite state of mind."  At a hearing, defendant reiterated that she was "without [a] duress defense . . . ."  Defendant continued, explaining that she merely intended to introduce the evidence to negate intent, not to create a duress defense.  The prosecution and the circuit court relied on this concession to understand and analyze defendant's request to admit evidence, ultimately concluding that the evidence would serve as a "backdoor way to get to a duress defense."  Defendant's explicit and unambiguous concession of the issue, which served to benefit defendant's legal position, constituted waiver.  See *People v Kowalski*, 489 Mich 488, 503-505; 803 NW2d 200 (2011) (explaining that a defense attorney's repeated statement that he had "no objection" to jury instructions constituted "waiver," leaving "no error to review"); *People v Traver*, 502 Mich 23, 40-41; 917 NW2d 260 (2018) (holding that a defense attorney's statement that he was "satisfied" with the circuit court's actions constituted a waiver of the argument that the court failed to provide an oral instruction); *United States v Walker*, 615 F3d 728, 733

than the Court's disregard for longstanding principles of preservation is that the duress defense adopted in the majority opinion has never before been successfully embraced in American jurisprudence. Never. This case is a striking display of judicial overreach, accomplished through a short, cursory opinion, in which ipse dixit stands in the place of sound legal reasoning.

---

(CA 6, 2010) (reasoning that a defense counsel's statement that he " 'does not dispute' " a legal position constituted "waiver," not just forfeiture).

Only after defendant had lost these arguments and the circuit court had ruled in the prosecution's favor did defendant change her position and argue that a duress defense was proper. By that time, the argument had been finally and irrevocably waived. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (explaining that a waived right is " 'relinquish[ed]' ") (citations omitted); *United States v Saucedo*, 226 F3d 782, 787 (CA 6, 2000) (reasoning that a waived argument is "forever foreclosed"); 28 Am Jur 2d, Estoppel & Waiver, § 186, p 651 ("It is well settled that a waiver once made is irrevocable even in the absence of consideration or of any change in position of the party in whose favor the waiver operates."); 31 CJS, Estoppel & Waiver, § 93, pp 442-443 ("A waiver when once made cannot be recalled, revived, expunged, or revoked, nor can the right waived be reclaimed, at least not without the consent of the adversary."). Recognizing that it had already resolved the issue, the circuit court denied defendant's request. On appeal, defendant returned to her initial position that duress is not a valid defense to a charge of depraved-heart murder. See, e.g., Defendant's Brief on Appeal (May 19, 2019) at 26 (arguing that the trial court could have given a jury instruction that stated "duress was not a viable defense"); Defendant's Application for Leave to Appeal in the Michigan Supreme Court (August 11, 2020) at 23 (same).

Given defendant's waiver, appellate review, let alone reversal, is inappropriate. *Carter*, 462 Mich at 215. But even if the Court used the more lenient "plain error" standard for untimely and unpreserved claims, reversal is not warranted. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Declining to accept a defense that has never before been recognized in Michigan, or anywhere else in this country, is a paradigmatic example of a challenge falling outside the plain-error standard. *People v Allen*, 507 Mich 597, 614; 968 NW2d 532 (2021) (stating that an error is "plain" only when it is "not subject to reasonable dispute") (quotation marks and citations omitted).

2

The majority rests its case on loose language from scattered sources that duress is not a defense to "intentional murder."[2] The cases relied upon by the majority at no point mention or discuss depraved-heart murder, and many held in favor of the prosecution and precluded a duress defense.[3] Unsurprisingly, whenever courts and other legal sources have directly addressed whether duress is available for any form of killing with malice, including depraved-heart murder, they have unambiguously rejected the majority's position.[4] Yet

---

[2] See *ante* at 5 (majority opinion).

[3] See *People v Reichard*, 505 Mich 81, 88, 95-96; 949 NW2d 64 (2020) (stating that, at common law, "duress was not permitted as an affirmative defense to murder"; holding that duress could apply to lesser crimes in felony-murder prosecutions; and reasoning that the prosecution would, despite the existence of duress, "still be able to proceed against the defendant on the . . . offense of second-degree murder"); *Cole v State*, 221 So 3d 534, 543 n 4 (Fla, 2017) (concluding that trial counsel was not ineffective for failing to investigate a duress defense for charges of kidnapping, robbery, and first-degree murder and noting in passing that a duress defense was not applicable to the murder charges); *Commonwealth v Vasquez*, 462 Mass 827, 834-835; 971 NE2d 783 (2012) (rejecting the defense of duress for a murder based on "extreme atrocity or cruelty," which includes murder by depraved heart, and reasoning that "the duress defense for any form of murder would . . . encourage killing"); *Tully v State*, 730 P2d 1206, 1210; 1986 OK CR 185 (Okla Crim App, 1986) (explaining that the logic of duress did not apply to a felony-murder charge because "the harm contemplated" by committing robbery, on its own, was not greater than "murder of an innocent"—not mentioning or discussing killings with malice, such as depraved-heart murder).

[4] See, e.g., *Sanders v State*, 942 So 2d 156, 161 (Miss, 2006) (rejecting a duress defense for a depraved-heart murder conviction, reasoning that "duress is not a legal defense to murder"); *People v Anderson*, 28 Cal 4th 767, 774, 780; 50 P3d 368 (2002) (examining a statute that "adopted the common law" and concluding that "duress is not a defense to any form of murder," including murders with implied malice such as depraved-heart murder); *State v Rumble*, 680 SW2d 939, 941-943 (Mo, 1984) (reasoning that, by adopting the common law, "duress is not a defense to the crime of murder—any murder," which included "depraved-heart murder"); 40 CJS, Homicide, § 181, p 629 ("The rule encompasses denial of the defense to all forms of murder" given that "duress cannot, as a matter of law, negate . . . malice[.]").

3

the majority relies on the lack of more extensive caselaw to *support* its position.[5] Instead, it may demonstrate that few serious jurists, before today, believed that a defendant could be acquitted of depraved-heart murder because of duress.

Moreover, the phrase "intentional murder," as used in the majority opinion, is an unhelpful pleonasm. All common-law murders are intentional. They all involve an intentional act. And they all either involve the intent to kill or the legal and moral equivalent to an intent to kill, otherwise described as "malice."[6] For centuries, our law has recognized that there is no legal, social, or moral reason to treat differently individuals who kill with intent to cause death and those individuals who kill with intentional disregard for human life.[7] In fact, depraved-heart murders can be and often are more reprehensible, and

---

[5] See *ante* at 6-7 (majority opinion).

[6] See *People v Dykhouse*, 418 Mich 488, 495; 345 NW2d 150 (1984) (explaining that second-degree murder can be proved equally by "one of three possible intents: the intent to kill, the intent to inflict great bodily harm, or the *intent* to create a very high risk of death or great bodily harm with the *knowledge* that death or great bodily harm is the probable result") (emphasis added); *People v Potter*, 5 Mich 1, 7 (1858) ("[A]t the common law, if a mortal blow was malicious," such as with "a reckless disregard of the safety or lives of others, the killing would be murder, and would be punishable in the same manner as though perpetrated with the deliberate design of taking the life of the victim."); see also *People v Goecke*, 457 Mich 442, 467; 579 NW2d 868 (1998) (reasoning that depraved-heart murder requires the "intent to do an act," is a "general intent crime," and is "constructively with a malicious intention") (quotation marks and citation omitted); 21 Am Jur 2d, Criminal Law, § 113, p 230 (explaining the basic principle of criminal law that "general intent" requires "proof that the person acted intentionally" as opposed to "accident, mistake, carelessness, or absent-mindedness").

[7] See note 6 of this opinion; Coke, The Third Part of the Institutes of the Laws of England (6th ed), p 57 ("If a man knowing that many people come in the street from a sermon, throw a stone over a wall, intending only to fear them, or to give them a light hurt, and thereupon one is killed, this is murder[.]"); *Robinson v State*, 307 Md 738, 744-745; 517 A2d 94 (1986) ("The common law treats [the depraved-heart] state of mind as just as blameworthy,

4

more deleterious to our social fabric, than intent-to-kill murders. Yet the majority now gives depraved-heart murderers the benefit of a duress defense, and thus an unprecedented path to complete exoneration.[8]

The majority cites *People v Reichard*, 505 Mich 81; 949 NW2d 64 (2020), in support of its decision.[9] A complete analysis of that case and surrounding caselaw suggests otherwise. In Michigan, "[w]hat was known at common law as the crime of murder . . . is now known under our statutory scheme as the crime of second-degree murder . . . ."[10] However, because felony murder requires only the "intent to commit a [lesser] felony," as compared to the "man-endangering-state-of-mind" of malice, Michigan has never recognized a common-law "felony murder."[11]

A similar logic underlay this Court's decision in *Reichard*.[12] The Court in *Reichard* permitted a duress defense against statutory felony-murder charges.[13] The Court did so

---

just as anti-social and, therefore, just as truly murderous as the specific intents to kill and to harm.") (quotation marks and citation omitted); accord *Goecke*, 457 Mich at 466-467.

[8] *See People v Luther*, 394 Mich 619, 622; 232 NW2d 184 (1975) (explaining that, if proven, "[a] successful duress defense excuses the defendant from criminal responsibility").

[9] See *ante* at 4-5 (majority opinion).

[10] *Dykhouse*, 418 Mich at 495, citing MCL 750.317.

[11] *People v Aaron*, 409 Mich 672, 723, 727-728; 299 NW2d 304 (1980) (quotation marks and citation omitted); see also *People v Pavlic*, 227 Mich 562, 565-566; 199 NW 373 (1924) (reasoning that an individual who merely commits a felony and thereby "unintentionally causes the death of another" is "not guilty of murder").

[12] *Reichard*, 505 Mich 81.

[13] MCL 750.316(1)(b).

5

because the underlying felony in felony murder "does not include as an element the killing of an innocent," let alone malice; duress could negate the underlying felony only, which failed to constitute murder. And despite the applicability of duress to the underlying felony, the Court in *Reichard* confirmed that the prosecution "would still be able to proceed against the defendant on the lesser included offense of second-degree [common-law] murder if the evidence supported that charge."[14] Second-degree murder includes depraved-heart murder.[15]

It is incongruous, at best, to apply logic underlying this Court's rejection of felony murder as a common-law crime in toto to create a duress defense for a long-established form of common-law murder. Even more so when the primary case cited in favor of that defense explicitly rejected it. Reviewing other sources, it is apparent that the occasional use of the term "intentional murder" in the law of duress is designed primarily to distinguish between crimes lacking the elements of death and malice, i.e., lesser included offenses in "felony murder" prosecutions, and crimes that include both elements, i.e., Michigan's second-degree murder.[16]

---

[14] *Reichard*, 505 Mich at 92, 95-96.

[15] See *Dykhouse*, 418 Mich at 495.

[16] See, e.g., 2 LaFave, Substantive Criminal Law (3d ed, 2017), § 9.7(b), pp 98, 100 (explaining that the common-law rule provides "duress cannot excuse murder" but reasoning that "intentional killing[s]" is more precise "since duress may excuse the underlying felony for what would otherwise be a felony murder" given the "unexpected[]" nature of felony murder; not mentioning depraved-heart murder whatsoever); *Tully*, 730 P2d at 1210 (reasoning that duress can be used to excuse felony murder because the defendant committed only a "lesser crime," "the harm contemplated by the defendant" in the case, robbery, was not equal to "*murder* of an innocent," and the common-law doctrine

6

The consequences of the Court's actions are disconcerting. After today's ruling, murder defendants will have a strong incentive to describe their actions in terms of a conscious disregard for death rather than an intent to kill. Criminal defendants have expansive rights to present defenses and request jury instructions that fit their theory of the case.[17] Defendants may very well argue their actions fit within depraved-heart murder, even if they are charged with intent-to-kill murder. And once a depraved-heart theory is admitted, the majority opinion will allow a duress defense. It will be very difficult, if not impossible, for prosecutors or trial courts to discount a state of mind alleged by a defendant. Intentionally acting to kill another individual and intentionally acting with conscious disregard for another individual's life can facially exhibit little difference. "Yes, I intentionally shot at her knowing she was there, but I did not intend to kill her." Before today's decision, the difference between those two forms of intent in a second-degree

did not apply), citing LaFave, § 9.7(b) (quotation marks and citations omitted; emphasis added).

[17] "When a defendant requests a jury instruction on a theory or defense that is supported by the evidence, the trial court must give the instruction." *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002); compare *People v Mills*, 450 Mich 61, 82; 537 NW2d 909 (1995) (concluding that a requested instruction is not appropriate when "the record is devoid of any evidence supporting [the] jury instruction"), with *People v Dupree*, 486 Mich 693, 712; 788 NW2d 399 (2010) (holding that a trial court improperly refused a requested instruction when the defendant "satisfie[d] the initial burden of producing some evidence" supporting the instruction); 40A Am Jur 2d, Homicide (2019), § 463, p 358 ("Where there is any evidence tending, in an appreciable degree, to support a particular theory of a case, the court may give instructions to the jury presenting the theory to them, and it has been held that the defendant is entitled to have charges given if there is any evidence as a foundation therefor, regardless of the weakness, insufficiency, inconsistency, or doubtful credibility of the proof.").

murder prosecution would be largely one of semantics. After today, however, the difference could decide whether a defendant is found guilty or acquitted.

Further, it is hard to see how the majority opinion will be limited to depraved-heart murders. Murders involving the intent to cause grievous bodily harm similarly lack an intent to cause death, or as the majority describes it, "intentional murder."[18] More than likely, the majority opinion will result in a sea change in the use of duress for homicide prosecutions.

The long-established principle that "duress is not a defense to murder" means exactly what it says.[19] This instinctive logic, passed down through generations of jurists,

---

[18] See *Dykhouse*, 418 Mich at 495. At common law, the differences between depraved-heart murder and murder with intent to cause great bodily harm were minimal, if not nonexistent. See 4 Blackstone, Commentaries on the Laws of England, pp **199-200 (stating that tying a boy "to a horse's tail" to "drag[] him along the park," causing death, was murder, as was "beat[ing] another in a cruel and usual manner . . . though he did not intend his death").

[19] Blackstone, p *30 (stating that the "fear and force" underlying duress "shall not acquit him of *murder*") (emphasis added), citing 1 Hale, History of the Pleas of the Crown, p 51; *Reichard*, 505 Mich at 88, 95 (stating that, at the common law, "duress was not permitted as an affirmative defense to murder" and duress could not prevent a prosecution for "second-degree murder"); 40 Am Jur 2d (2019), Homicide, § 107, p 721 ("It is generally held that neither duress, coercion, nor compulsion are defenses to murder."); 40 CJS, Homicide, § 181, p 629 ("The rule encompasses denial of the defense to all forms of murder" given that "duress cannot, as a matter of law, negate the [element of] malice[.]"); 40 ALR2d 90, § 2.2, p 148 ("Defense of duress is not applicable to murder."); *People v Dittis*, 157 Mich App 38, 41; 403 NW2d 94 (1987) ("[D]uress is never a defense to murder[.]"), quoting *People v Young*, 120 Mich App 645, 653; 327 NW2d 329 (1982) (BEASLEY, J., dissenting on other grounds), overruled by *Reichard*, 505 Mich at 90 n 18, to the extent *Dittis*'s holding has been interpreted broadly as duress not being allowed as a defense to *any* "homicide."; *West v Bell*, 550 F3d 542, 555 (CA 6, 2008) ("[D]uress is never a defense to murder."); *United States v LaFleur*, 971 F2d 200, 205 (CA 9, 1991) (explaining, while interpreting the federal murder statute, that "the common law rejected duress as a defense to murder"), citing, in part, *Arp v State*, 97 Ala 5; 12 So 301 (1893);

8

remains as powerful today as it did in centuries past: no forms of killing with malice can or should be excused on the basis of duress. Because the majority reverses a murder conviction on the basis of a duress defense never previously recognized in the history of this country, and does so despite the fact that defendant waived the issue, I respectfully dissent.

Brian K. Zahra
David F. Viviano

---

*United States v Buchanan*, 529 F2d 1148, 1153 (CA 7, 1975) ("[C]oercion is not a defense to murder."), citing *RI Recreation Ctr v Aetna Cas & Surety*, 177 F2d 603 (CA 1, 1949).

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                         No. 161835

THERESA MARIE GAFKEN,

      Defendant-Appellant.

_____

VIVIANO, J. (*dissenting*).

In a little over seven brisk pages, the majority comes to a conclusion that, as far as I can tell, has not been reached by any other common-law court: that the duress defense applies to depraved-heart murder. The few courts to have directly opined on the issue have, albeit in dicta, stated that the defense is inapplicable to this form of murder. And many courts and commentators have more broadly stated that duress does not apply to *any* charge of murder. None of this deters the majority, which ignores many of the relevant materials and misreads others. The resulting analysis is as flawed as it is cursory. The majority postures its case as a simple extension of *People v Reichard*, 505 Mich 81; 949 NW2d 64 (2020). But nothing in the holding or logic of *Reichard* supports the majority's result. Worse still, the majority reaches its result despite the fact that defendant, Theresa M. Gafken, conceded this very issue below. Therefore, the Court should not have decided this issue at all. But as it has done so, I would hold that duress is inapplicable to second-degree depraved-heart murder and therefore dissent.

In April 2018, a police officer saw a white Camaro, driven by defendant, speeding at around 50 to 60 miles per hour (mph) in a 25-mph zone. The officer activated his siren, and while defendant initially put on the Camaro's turn signal and slowed down, defendant then abruptly turned onto a second street and sped away from the officer. The officer was driving at around 90 mph, but defendant still pulled away from him. During the chase, defendant swerved between traffic lanes. Defendant eventually crashed after running a red light, sideswiping a truck and ramming into a Jeep. The driver of the Jeep was killed on impact. Data from the Camaro indicated that it was traveling at about 117 mph immediately before the accident in a 35-mph zone. There was no evidence of braking on the road. Defendant and the two other men who were in the Camaro sustained serious injuries.

Defendant was arrested and charged with second-degree murder. The officers' investigation revealed that defendant's blood contained tetrahydrocannabinol (THC), which is the main psychoactive substance found in cannabis, and that her driver's license was suspended. After her arrest, defendant stated that the men had asked for a ride and acted suspiciously. She intended to pull over. The next thing she remembered was sitting in the car after the accident.

Prior to trial, defendant filed a motion in limine to allow testimony that she acted out of fear for her life based on the actions of the other men in the car. Specifically, she wanted to testify that one of the men, Michael Scandalito, who was being sought for a parole violation—and for whom defendant knew an arrest warrant had been issued—had thrust a hard object into her ribs, which defendant believed to be a gun. Believing she

2

would be killed, defendant then sped away from the police. Defendant also requested that she be allowed to present evidence that this act triggered her post-traumatic stress disorder. The trial court noted that defendant wanted to establish either a duress defense or a diminished-capacity defense but rejected duress as inapplicable to second-degree murder and diminished capacity as not recognized in this state. The jury convicted defendant of second-degree murder.

Defendant appealed in the Court of Appeals, which held that the trial court did not err by excluding the evidence of duress. The Court noted that while *Reichard* had disapproved of a broad rule that "duress is not a defense to homicide," *Reichard* also "could be construed as suggesting that the Michigan Supreme Court would be open to allowing a duress defense . . . perhaps to even a charge of second-degree murder that is pursued solely on the malice prong regarding the creation of a very high risk of death or engaging in wanton and willful conduct." *People v Gafken*, unpublished per curiam opinion of the Court of Appeals, issued June 18, 2020 (Docket No. 345954), p 5 (quotation marks and citation omitted). However, because *Reichard* limited its own holding to felony murder, not second-degree murder, *People v Henderson*, 306 Mich App 1; 854 NW2d 234 (2014), overruled in part on other grounds by *Reichard*, 505 Mich 81, remained good law on this specific point, and defendant could not argue a duress defense. *Gafken*, unpub op at 5.

Thereafter, defendant sought leave to appeal in this Court. We ordered argument on the application to address, among other things, "whether the trial court erred in excluding evidence that the defendant was threatened and of the defendant's mental state at the time of the offense[.]" *People v Gafken*, 508 Mich 961, 962 (2021).

3

II

A

As an initial matter, the majority should not have reached the question of whether duress applies. "Michigan has long recognized the importance of preserving issues for appellate review." *People v Carines*, 460 Mich 750, 762; 597 NW2d 130 (1999). " 'In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.' " *Mich Gun Owners, Inc v Ann Arbor Pub Sch*, 502 Mich 695, 709-710; 918 NW2d 756 (2018), quoting *Greenlaw v United States*, 554 US 237, 243; 128 S Ct 2559; 171 L Ed 2d 399 (2008). Accordingly, unpreserved issues are generally not reviewed. See *Napier v Jacobs*, 429 Mich 222, 227; 414 NW2d 862 (1987). And this would seem especially true if the party had, at some point in the proceedings, conceded the issue. Cf. *Mich Gun Owners, Inc*, 502 Mich at 709 (noting that the party had stated in this Court that it was not providing argument on the issue). As we recently explained, reviving unpreserved claims sends a bad signal to parties. *Id*. at 710 n 9 ("Granting leave to appeal under the circumstances presented would send a message that we should and do decline to send: Abandon an issue in your application for leave to appeal? And definitively distance yourself from that legal theory at oral argument? Worry not! The Court will revive the theory for you and give you free rein to try again after hearing oral argument on that application.").

4

In the present case, this Court did order argument on the duress defense. But that was an imprudent mistake. In defendant's briefing in the Court of Appeals, defendant waived the duress defense, admitting that it was unavailable:

> In the present case, *the precluded evidence was not a means of claiming that Ms. Gafken was innocent of homicide*. That would clearly be prohibited by law. The only issue at trial was whether Gafken was guilty of second-degree murder or involuntary manslaughter. Clearly the disputed testimony was not intended to, nor could it, operate as a defense to homicide.

She included this exact same language in her application in this Court. Further, defendant argued that, to avoid any possible confusion by the jurors, the trial court could have given a jury instruction stating that "duress was not a viable defense to . . . second degree murder . . . ." Thus, as opposed to arguing that duress was a defense to murder, defendant claimed that evidence of Scandalito's threat could be used to negate the element of intent. By nevertheless taking up the duress-defense issue and deciding it in defendant's favor, the Court has acted improperly.[1]

---

[1] It is true that the preservation requirement is not an absolute rule and that we sometimes address unpreserved issues. See *Klooster v Charlevoix*, 488 Mich 289, 310; 795 NW2d 578 (2011). But that occurs, generally, when deciding the unpreserved issue is " ' "necessary to a proper determination of a case . . . ." ' " *Id*. (citation omitted). It is not clear to me how the applicability of the defense here was necessary to deciding the case. Indeed, the majority does not purport to decide the issue in order to resolve defendant's underlying argument—it decides the issue and does not opine on the argument defendant presented. And while the Court of Appeals below did address the duress defense, its decision was unpublished and thus not binding. Moreover, it would have been simple enough to vacate the lower court's discussion of the issue. Justice WELCH's concurrence complains that "it would be unjust" to ignore this issue "merely because of a few sentences of her appellate attorney's argument in the Court of Appeals." Of course, that is exactly how preservation works—clients generally are held to the representations and choices of their attorneys in court. See *People v Carter*, 462 Mich 206, 218; 612 NW2d 144 (2000)

5

B

1

Because the majority reaches the merits of this waived issue, however, I will do so as well to point out the flaws in its analysis. The majority's conclusion hinges on the premise that the duress defense is inapplicable only to *intentional* murders. Because (as discussed more below) second-degree murder under a depraved-heart theory is not an intentional murder, the duress defense applies, according to the majority. The majority's premise is simply incorrect and, not surprisingly, is based on loose dicta that does not reflect any actual holding by any court.

To understand the fulcrum of the majority's opinion, it is important first to examine the elements of second-degree murder: " '(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse.' " *People v Wafer*, 509 Mich 31, 40; ___ NW2d ___ (2022) (citation omitted). All forms of murder require malice. *Maher v People*, 10 Mich 212, 218 (1862). For second-degree murder, there are three types of malice: (1) "the intent to kill," (2) "the intent to cause great bodily harm," and (3) "the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998). We have also defined the third type of malice as "the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result." *People v Dykhouse*, 418 Mich 488, 495; 345

---

(noting that although there are certain rights an attorney cannot waive, a defendant is bound by many of his or her attorney's decisions).

NW2d 150 (1984).[2]  As is clear, an intentional act is a necessary element of depraved-heart murder.  It simply does not require the specific intent to kill.

When this third type of malice is at issue, the offense is known as "depraved-heart murder."  See *Goecke*, 457 Mich at 464 & n 24.  As described by LaFave, this form of murder encompasses "[e]xtremely negligent conduct, which creates what a reasonable man would realize to be not only an unjustifiable but also a very high degree of risk of death or serious bodily injury to another or to others—though unaccompanied by any intent to kill or do serious bodily injury—and which actually causes the death of another . . . ." 2 LaFave, Substantive Criminal Law (3d ed, October 2022 update), § 14.4.  The Model Penal Code explains it as homicide that "is committed recklessly under circumstances manifesting extreme indifference to the value of human life."  Model Penal Code, § 210.2(1)(b) (2021).  New York's top court has described it as follows:

> [D]epraved indifference is best understood as an utter disregard for the value of human life—a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not. Reflecting wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts, depraved indifference is embodied in conduct that is "so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy" as to render the actor as culpable as one whose conscious objective is to kill.  Quintessential examples are firing into a crowd; driving an automobile along a crowded sidewalk at high speed; opening the lion's cage at the zoo; placing a time bomb in a public place; poisoning a well from which people are accustomed to draw water; opening a drawbridge as a train is about to pass over it and dropping stones

---

[2] For purposes of the discussion of the duress defense, it is irrelevant which definition applies.

from an overpass onto a busy highway. [*People v Suarez*, 6 NY3d 202, 214; 844 NE2d 721 (2005) (citations omitted).][3]

See also *Maher*, 10 Mich at 219 ("[T]he act must be prompted by, or the circumstances indicate that it sprung from, a wicked, depraved or malignant mind—a mind which, even in its habitual condition and when excited by no provocation which would be liable to give undue control to passion in ordinary men, is cruel, wanton or malignant, reckless of human life, or regardless of social duty.").

Because this form of malice "may be established even absent an actual intent to cause a particular result," it is a general-intent crime. *Goecke*, 457 Mich at 466. In essence, the "malice is implied when the circumstances attending the killing demonstrate an abandoned and malignant heart," i.e., " 'when the defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with wanton disregard for human life.' " *Id*. at 467, quoting *People v Fuller*, 86 Cal App 3d

---

[3] It is worth noting that numerous treatises stretching back to the English common law also provide as an example of depraved-heart malice the reckless driving of vehicles or horses—the historical antecedent of the conduct defendant was found guilty of here. See 1 East, A Treatise of the Pleas of the Crown, p 231 ("Thus, if a person, breaking in an unruly horse, wilfully ride him among a crowd of persons, the probable danger being great and apparent, and death ensue from the viciousness of the animal, it is murder."); 1 Hale, History of the Pleas of the Crown, p 476 ("*A.* drives his cart carelessly, and it runs over a child in the street, if *A.* have seen the child, and yet drives on upon him, it is murder[.]"); Foster, *A Report of Some Proceedings* (Oxford: Clarendon Press, 1762), p 263 ("A person driving a cart or other carriage happeneth to kill. If he saw or had timely notice of the mischief likely to ensue, and yet drove on, it will be murder. For it was wilfully and deliberately done. Here is the heart regardless of social duty . . . .") (capitalization altered); see also Coke, The Third Part of the Institutes of the Laws of England (London: Rawlins, 1680), p 57 (explaining under the English common law that "[i]f a man knowing that many people come in the street from a sermon, throw a stone over a wall, intending only to fear them, or to give them a light hurt, and thereupon one is killed, this is murder").

618, 628; 150 Cal Rptr 515 (1978). Depraved-heart murder therefore is not an intentional homicide in the traditional sense—it is not one in which the defendant actually intends to kill.[4]

The majority uses the lack of intent to kill to distinguish depraved-heart murder from other types of murder for purposes of the duress defense. A duress defense applies to excuse a defendant of a crime when the defendant can show:

> "A) The threatening conduct was sufficient to create in the mind of a reasonable person the fear of death or serious bodily harm;
>
> B) The conduct in fact caused such fear of death or serious bodily harm in the mind of the defendant;
>
> C) The fear or duress was operating upon the mind of the defendant at the time of the alleged act; and
>
> D) The defendant committed the act to avoid the threatened harm." [*Reichard*, 505 Mich at 88 (quotation marks and citation omitted).]

In *Reichard*, 505 Mich at 88, we explained the longstanding common-law rule that "duress was not permitted as an affirmative defense to murder." Mirroring the common law, our reference to murder there was not qualified, and elsewhere we "note[d] that several

---

[4] See *Suarez*, 6 NY3d at 226 (Graffeo, J., concurring in part and dissenting in part) ("There is a readily understandable distinction between intentional and depraved indifference [i.e., heart] murders—the killer's state of mind. As we have recognized, a person can act intentionally by having the conscious objective to cause death, or recklessly by disregarding a known risk of death, but cannot act with both mental states simultaneously with regard to the same result. . . . Intentional and depraved indifference murder are also distinguishable because once the jury determines that a homicide was committed purposefully, 'the depravity of the circumstances under which the intentional homicide is committed is simply irrelevant.' This is so because an intentional killing is, by its very nature, ' "wanton . . . deficient in [ ] moral sense . . . [and] devoid of regard of the life or lives of others." ' ") (citations omitted).

treatises state more precisely that duress is not an affirmative defense to *murder* or intentional homicide, as opposed to homicide generally." *Id*. at 90 n 18 (emphasis added). But we specifically declined to address whether duress applied only to "any form of homicide . . . ." *Id*.

2

To the extent we implied any answer to the present question in *Reichard*, it was in the negative, i.e., that duress would not apply to second-degree murder. *Reichard* explained that the application of duress to first-degree felony murder simply negated the aggravator element of MCL 750.316(1)(b), which elevates a second-degree murder to first-degree murder. *Id*. at 95. But, importantly, we stated that "[w]ith the aggravator element negated, a prosecutor would still be able to proceed against the defendant on the lesser included offense of second-degree murder if the evidence supported that charge." *Id*. at 95-96. "In other words," we concluded, "the defendant's duress defense to the underlying felony would only prevent the enhancement of second-degree murder to first-degree murder." *Id*. at 96. Addressing this language, federal courts after *Reichard* have continued to apply pre-*Reichard* caselaw from our Court of Appeals holding that duress is inapplicable to second-degree murder. See *Baker v Brewer*, opinion of the United States District Court for the Eastern District of Michigan, issued May 5, 2021 (Case No. 2:15-CV-11629), p 8 (noting that *Reichard* stated that duress would only stop enhancement of a second-degree-murder charge to a first-degree charge and concluding that "[b]ecause petitioner was charged with, and convicted of, second-degree murder, duress was an

10

unavailable defense in [the] case"), citing *People v Dittis*, 157 Mich App 38, 40; 403 NW2d 94 (1987).

Nevertheless, the majority misreads the treatises cited in *Reichard* and a few other cases to suggest that duress is inapplicable only to intent-to-kill murders. But this facile use of the sources is seriously flawed, as the majority seems to recognize when it states that "we are aware of no court that has considered the issue of whether duress can be raised as a defense to an unintentional homicide." Indeed, all the cases and sources the majority cites for support do not even discuss or analyze the matter, let alone decide whether duress applies to unintentional murders. For example, the court in *Cole v State*, 221 So 3d 534, 543 n 4 (Fla, 2017), observed in a footnote that "duress is not a defense to intentional homicide," but the opinion does not address at all the applicability of the defense to any form of homicide, much less murders in which the defendant lacks an intent to kill. (Quotation marks and citation omitted.) The charges in that case involved premeditated first-degree murder and felony murder. *Id*. In rejecting the defendant's assertion that his trial counsel was ineffective for developing a duress defense, the court examined the strategic merits of pursuing such a defense based on the facts in that case and the effect of failing to pursue the defense. *Id*. at 543-544. The opinion has absolutely nothing to do with the issue we face here.

Or consider the majority's truncated quotation of a leading treatise, 2 LaFave, Substantive Criminal Law (3d ed, October 2022 update), § 9.7(b). The full discussion states:

> But the case law in the absence of statute has generally held that duress cannot excuse murder—or, as it is better expressed (since duress may excuse the underlying felony for what would otherwise be a felony murder), duress

11

cannot excuse the intentional killing of (or attempt to kill) an innocent third person. [*Id.*]

The author's limitation to intentional killings was obviously not intended to address all forms of murder, but instead felony murder. Again, as the majority notes, no court has addressed this issue, and thus none of the citations in the treatise supports the proposition that duress can apply to unintentional killings.[5]

The majority then limply asserts that other authorities suggesting a broader rule— "that duress is not a defense to 'murder' without qualification"—"generally . . . involve[] interpretation of a statute providing under what terms a duress defense can be raised." This is incorrect. Neither of the two common-law treatises (which were not addressing statutes) quoted in *Reichard* contained the narrower rule—both suggest duress was inapplicable to

---

[5] Indeed, the treatise cites two cases, one of which is *Commonwealth v Vasquez*, 462 Mass 827, 835; 971 NE2d 783 (2012). As discussed below, see note 9 of this opinion, *Vasquez* indicates that duress is inapplicable even to forms of murder that lack an intent to kill. The other cited case, *Arp v State*, 97 Ala 5; 12 So 301 (1893), did not state that the duress defense is inapplicable only to intent-to-kill murders and did not address murders lacking an intent to kill.

Perhaps in a mark of what little thought has gone into the present question, some authorities have interchangeably used both broad and narrow phrasing of the rule, i.e., they say both that duress is not a defense to murder *and* it is not a defense to intentional murder or homicide. See 40 CJS, Homicide (November 2022 update), § 181 ("Generally, duress . . . is not a defense to a charge of homicide. . . . The rationale for denying the defense of duress to an intentional killing is premised on the theory that one should risk or sacrifice one's own life rather than take the life of an innocent person. The rule encompasses denial of the defense to all forms of murder, including homicides resulting from an intent to do grievous bodily harm, as well as an actual intent to kill and seems to include all other offenses where an intent to kill is an essential element."); see also *Wright v State*, 402 So 2d 493, 498 (Fla App, 1981) (quoting caselaw articulating the broad rule pertaining to all homicides and then adopting the narrow rule focused on intentional homicides). Of course, all murders involve intentional acts, and the specific intent to kill is legally equivalent to the intent required for depraved-heart murder.

all killings, which is supported by English caselaw as well.[6]  And numerous courts and

other commentators (none of them addressing direct language in statutes) from early in the

common law until the present likewise express the broader rule.[7]  Some of the older sources

---

[6] See *Reichard*, 505 Mich at 88-89 (" '[I]f a man be desperately assaulted, and in peril of death, and cannot otherwise escape, unless to satisfy his assailant's fury he will kill an innocent person then present, the fear and actual force will not acquit him of the crime and punishment of murder, if he commit the fact; for he ought rather to die himself, than kill an innocent[.]' ") (alteration in original), quoting 1 Hale at 51; *Reichard*, 505 Mich at 89 (" 'Another species of compulsion or necessity is what our law calls *duress per minas*; or threats and menaces, which induce a fear of death or other bodily harm, and which take away for that reason the guilt of many crimes and misdemeanors; at least before the human tribunal. . . .  This however seems only, or at least principally, to hold as to positive crimes, so created by the laws of society; and which therefore society may excuse; but not as to natural offences, so declared by the law of God, wherein human magistrates are only the executioners of divine punishment.  And therefore though a man be violently assaulted, and hath no other possible means of escaping death, but by killing an innocent person; this fear and force shall not acquit him of murder; for he ought rather to die himself, than escape by the murder of an innocent.' "), quoting 4 Blackstone, Commentaries on the Laws of England, p *30.  Lord Hale's treatise more clearly articulated the broader rule.  See 1 Hale at 51 ("If a man be menaced with death, unless he will commit an act of treason, *murder*, or robbery, the fear of death does not excuse him, if he commit the act[.]") (emphasis added).  Citing these treatises and other cases from the English common law, Lord Griffiths in the House of Lords in 1987—then England's highest court—observed that "[f]or centuries it was accepted that English criminal law did not allow duress as a defence to murder."  *R v Howe* [1987] AC 417 (HL).

[7] See *Annachamy v Holder*, 733 F3d 254, 260 n 6 (CA 9, 2013) ("Duress does not excuse murder or even reduce murder to manslaughter. . . .  And in many jurisdictions, duress does not excuse attempted murder or aiding and abetting murder either."), overruled on other grounds by *Abdisalan v Holder*, 774 F3d 517 (CA 9, 2015) (en banc); *Sanders v State*, 942 So 2d 156, 161 (Miss, 2006) ("[L]ongstanding Mississippi law holds that duress is not a legal defense to murder."); 40 Am Jur 2d (November 2022 update), Homicide, § 107 ("It is generally held that neither duress, coercion, nor compulsion are defenses to murder; nor does duress mitigate murder to manslaughter."); Mulroy, *The Duress Defense's Unchartered Terrain: Applying It to Murder, Felony Murder, and the Mentally Retarded Defendant*, 43 San Diego L Rev 159, 172 (2006) ("The general common-law rule is that duress cannot be a defense to murder."); Reed, *Duress and Provocation as Excuses to Murder: Salutary Lessons from Recent Anglo-American Jurisprudence*, 6 J Transnat'l L &

13

note that duress was also inapplicable to other crimes not involving killing at all, including treason and robbery.[8]  From this, it would appear that the more prevalent and longer-established version of the rule is the broader one.[9]

---

Pol'y 51, 58 (1996) ("The virtually unassailable position of Anglo-American common law has been that duress never excuses murder and that the threatened individual ought to die himself rather than escape by killing another human being."); Dressler, *Exegesis of the Law of Duress: Justifying the Excuse and Searching for its Proper Limits*, 62 S Cal L Rev 1331, 1343 (1989) ("[T]here is considerable authority or dictum for the proposition that the defense [of duress] may not be pleaded in murder prosecutions."); Snowden, *Second Degree Murder, Malice, and Manslaughter in Nebraska: New Juice for an Old Cup*, 76 Neb L Rev 399, 445 (1997) ("Nebraska and most jurisdictions do not recognize duress in a homicide case."); cf. 1 Wharton's Criminal Law (16th ed, September 2022 update), § 15:9 ("At common law and by statute in many states, a defendant is not allowed to take the life of an innocent third person even when he is ordered to do so under a threat of instant death. . . .  In prohibiting the duress defense in murder cases, the law demands heroic sacrifice on the part of the individual . . . .") (citations omitted); 1 East at 225 (citing Hale and writing that duress "is no legal excuse" for homicide if another had exerted "moral force" and made threats against a defendant "in order to compel him to kill" another).

The highest court in Massachusetts—one of the states that the majority cites as adopting the narrow rule, which is incorrect for many reasons, as discussed below—has more recently articulated the broad rule, citing the very case the majority here cites as adopting the narrow rule.  See *Commonwealth v Concepcion*, 487 Mass 77, 94; 164 NE3d 842 (2021) ("The defendant is correct: duress is not a defense to murder."), citing *Vasquez*, 462 Mass at 835.

[8] See, e.g., 1 Hale at 51.

[9] Justice WELCH's concurrence questions the accuracy of Lord Hale and Lord Blackstone's pronouncements on this matter, which have formed the basis for centuries of common-law jurisprudence.  One would think that to mount such an attack, not only must there be convincing support for the historical assertion but also some rationale for overturning the last four centuries of law.  The concurrence provides nothing of the sort.  Instead, it cites a lone article, Elkington, *The Historical Development of Duress and the Unfounded Result of Denying Duress as a Defence to Murder* (Online First publication), J Crim L (2022), available at <https://journals.sagepub.com/doi/10.1177/00220183221093993> [Click "PDF / ePub"] (accessed December 12, 2022), which addresses the historical use of duress as a defense for treason in the context of war and rebellion, including in cases in which the defendant had killed.  The scholar infers from this use of the defense that the defense would

14

The majority is further incorrect that no courts have considered this issue. To be sure, the caselaw on this issue is sparse, and the relevant comments are arguably dicta. But the courts that have addressed the issue disagree with the majority. In *People v Anderson*, 28 Cal 4th 767; 50 P3d 368 (2002), the Supreme Court of California rejected the argument that duress could apply to first-degree murder. The concurring and dissenting opinions, the *Anderson* majority observed, argued that "duress especially should be a defense to implied-malice second degree murder. It evokes the image of an innocent person who is forced at gunpoint by fleeing armed robbers to drive recklessly, and who is then charged with murder when a fatal accident ensues." *Id*. at 779. The court ruled out duress in these circumstances, however. It stated, "Accepting the duress defense for any form of murder would . . . encourage killing." *Id*. at 778. And, later in the opinion, the court made the scope of its pronouncement even clearer: "we conclude that duress is not a defense to any

---

apply in cases of intentional killings. But treason and murder are different offenses, and nowhere does the scholar cite a historical case in which the defense was applied to the latter crime. Murder involves malice, which is a concept not at all mentioned by the scholar or apparently germane to treason. As explained above and below, malice for murder represents an express or implied intent to take a life. "The essence of high treason," by contrast, "was a treacherous usurpation of or challenge to the king's royal authority . . . ." Baker, *An Introduction to English History* (4th ed, 2002), p 526. The gravamen of the crimes are clearly different, even if death sometimes ensues during the commission of treason. Moreover, there are practical and political problems attending the prosecutions of treason post-rebellion that put further distance between the crimes. Many legal scholars over the centuries have questioned whether treason should be applied after armed rebellions. See Nicoletti, *Secession on Trial: The Treason Prosecution of Jefferson Davis* (New York: Cambridge University Press, 2017), pp 261-265. In short, it is one thing to speculate on history in an academic article—it is another altogether to rely on the speculations when formulating the law for our state.

15

form of murder." *Id.* at 780.[10]  This has been repeated in numerous subsequent cases.  See, e.g., *People v Hinton*, 37 Cal 4th 839, 882; 126 P3d 981 (2006) (" '[D]uress is not a defense to *any* murder . . . .' "), quoting *People v Maury*, 30 Cal 4th 342, 421; 68 P3d 1 (2003).

The majority here cites *Anderson*, but only partially, eliding its most relevant parts. Instead of a full and candid discussion of the case, the majority notes only *Anderson*'s suggestion that evidence of duress might still be relevant to determine whether the defendant acted with the requisite *mens rea* for murder.  The majority therefore provides a misleading portrait of *Anderson* by failing to acknowledge that opinion's entire discussion of the very issue we are deciding here.

The majority also appears to distinguish *Anderson* on the basis that it involved a duress defense enshrined in a statute.  See *Anderson*, 28 Cal 4th at 773, discussing Cal Penal Code, § 26.  But the court held that the statute simply adopted the common-law defense of duress at the time of enactment.  *Id.* at 774, 780.  Significantly, the court noted that the common-law defense during that period was applicable to all murders.  *Id.* Although at the time, all murder convictions were punishable by death, the court rejected the argument that the legislature meant to prohibit use of the duress defense only for murders subject to the death penalty.  *Id.* at 774-775.[11]

The majority also mistakenly relies on *Commonwealth v Vasquez*, 462 Mass 827, 835; 971 NE2d 783 (2012), to support its narrow view of the rule.  *Vasquez* actually

---

[10] Because the charge at issue in *Anderson* was first-degree murder, the court's comments on other forms of murder were arguably dicta.

[11] The court reached this conclusion even though the statute itself only excluded from the defense a "crime . . . punishable with death . . . ."  Cal Penal Code, § 26.

16

discussed almost the precise issue before our Court and reached a conclusion far different than the majority's. The court stated, "[W]e hereby reject duress as a defense to deliberately premeditated murder, murder committed with extreme atrocity or cruelty, and murder in the second degree . . . ." *Id*. Under Massachusetts law, malice for second-degree murder requires an intent to harm, although not necessarily to kill. See *Commonwealth v Estremera*, 383 Mass 382, 394-395; 419 NE2d 835 (1981) ("The malice aforethought necessary for second degree murder requires a finding that the defendant intended to inflict injury on the victim without legal excuse or palliation. . . . Although the defendant need not have intended to kill the victim, at the very least he must have intended 'to do an act creating a plain and strong likelihood that death or grievous harm will follow.' ") (citation omitted). This is similar to our depraved-heart murder to the extent that neither requires an intent to kill.

In a similar manner, first-degree murder in Massachusetts under an "extreme atrocity or cruelty" theory requires proof of malice aforethought and that the murder was committed with extreme atrocity or cruelty. *Commonwealth v Szlachta*, 463 Mass 37, 45; 971 NE2d 1281 (2012). Under Massachusetts law, malice is supplied not only by intent to kill, but also by an intent " 'to cause grievous bodily harm, or to do an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow.' " *Id*. at 45-46 (citation omitted). No other intent is necessary. *Id*. at 47. Thus, it appears that a murder "with extreme atrocity or cruelty" can lack the intent to kill. This form of murder was at issue because two of the defendants were convicted of it. As a result, *Vasquez*'s ruling that duress is inapplicable

17

to these forms of murder would seem to preclude use of the defense even in cases involving unintentional killings.[12]

It appears that the duress defense has been extended to the present circumstances only by statutes and model statutes. But in many states, the statutes have not extended the defense to depraved-heart murder.[13] And other states that allow the defense to apply to

---

[12] The court did note, however, that it had statutory authority in certain murder cases to "direct the entry of a verdict of a lesser degree of guilt" based on "any other reason that justice may require . . . ." Mass Gen Laws, ch 278, § 33E. The court observed that this authority might be invoked in these circumstances. *Vasquez*, 462 Mass at 835.

[13] See, e.g., Ala Code 13A-3-30 ("The defense [of duress] provided by this section is unavailable in a prosecution for (1) murder; or (2) any killing of another under aggravated circumstances"); Colo Rev Stat 18-1-708 (excluding the duress defense for Class 1 felonies, which under Colo Rev Stat 18-3-102(1)(d) contains a provision analogous to depraved-heart murder: "[u]nder circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally, he knowingly engages in conduct which creates a grave risk of death to a person, or persons, other than himself, and thereby causes the death of another"); Ga Code Ann 16-3-26 (excluding duress from all murder offenses); Iowa Code 704.10 (excluding any offense pertaining to "an act by which one intentionally or recklessly causes physical injury to another"); Kan Stat Ann 21-5206(a) (excluding from the scope of the defense murder and voluntary manslaughter); La Stat Ann 14:18(6) (excluding murder); Mo Rev Stat 562.071(2) (excluding murder); Or Rev Stat 161.270(1) (excluding murder); Wash Rev Code 9A.16.060(2) (excluding "murder, manslaughter, [and] homicide by abuse").

An Arizona court applied such a statute in *State v Perez-Perez*, unpublished memorandum decision of the Arizona Court of Appeals, issued January 5, 2010 (Case No. 1 CA-CR 08-0689), p 1, in which the defendant drove away from the police, who were attempting to conduct a traffic stop—the pursuit ended in an accident that caused the death of another driver. The defendant claimed that a passenger in his car forced him to flee at gunpoint. *Id*. The defendant was charged with first-degree felony murder and second-degree murder; the jury was also given instructions on manslaughter. *Id*. The defendant was found guilty of second-degree murder. In Arizona, this offense is committed "when, '[u]nder circumstances manifesting extreme indifference to human life, the person recklessly engages in conduct that creates a grave risk of death and thereby causes the death of another person.'" *Id*. (citation omitted). This resembles our crime of depraved-heart murder. The defendant challenged a jury instruction that duress was not an excuse to this

18

this form of murder limit its effect: duress is not a full defense but only reduces certain homicide charges to second-degree murder or manslaughter.  Minn Stat 609.20 (allowing the reduction to manslaughter for intentional killings); NJ Stat Ann 2C:2-9 (allowing the reduction to manslaughter in all cases of murder); Wis Stat 939.46(1) (allowing reduction of first-degree intentional homicide to second-degree intentional homicide).  Other states would appear to allow the defense in the present circumstances.[14]

None of these statutes offers a firm ground for analogy here, not the least because they are the products of legislative rather than judicial action and thus their rationale is sometimes more opaque.  The Model Penal Code (the MPC), for example, allows the defense for any charge when there exists "the use of, or a threat to use, unlawful force against his person or the person of another, that a person of reasonable firmness in his situation would have been unable to resist."  Model Penal Code, § 2.09(1) (2021).  It is not allowed when, among other things, "the actor recklessly placed himself in a situation in which it was probable that he would be subject to duress."  Model Penal Code, § 2.09(2) (2021).  But the MPC goes much further than defendant is asking for here, and it is directly contrary to our law.  Yet, it also contains a key restriction on use of the defense that the

charge.  The appellate court upheld the instruction, noting that under statutory law, duress was not a defense to any homicide.  *Id*. at 2, citing Ariz Rev Stat Ann 13-412(C) ("The defense provided by subsection A [duress] is unavailable for offenses involving homicide or serious physical injury.").

[14] Some states simply exclude the duress defense for crimes punishable by death.  See, e.g., Idaho Code 18-201(4); Mont Code Ann 45-5-102(2), citing Mont Code Ann 56-18-222; Nev Rev Stat 194.010(8).  Arguably by excluding the defense from certain crimes, an implication arises that it would be allowed for other crimes.

majority has not seen fit to craft here: that defendants not be reckless in placing themselves into positions that might involve duress. The majority appears to reject by silence this prudent and reasonable limitation on the defense.

3

Perhaps lost in the majority's quibbling about the phrasing of the rule is any persuasive rationale for recognizing duress as a defense to unintentional murders. I do not see one.

Most importantly, the malice necessary for depraved-heart murder—which, as explained above, is an implied malice arising from an actor's disregard for the high risk of death posed by his or her conduct—has long been viewed as equivalent to an express malice consisting of an intent to kill. As one scholar described the development of this view, the concept of "malice aforethought . . . originally may have meant more or less what it sounds like—a deliberate, planned killing." Michaels, *Acceptance: The Missing Mental State*, 71 S Cal L Rev 953, 1003 (1998). But soon, the concept of malice was extended beyond that limited category to killings marked by recklessness or an intent to do great bodily harm. Moreland, *The Law of Homicide* (Indianapolis: Bobbs-Merrill Co, 1952), pp 13-15. Courts "concluded [these] killings that perhaps could not literally be described as including malice aforethought were nonetheless bad enough to 'deserve the extreme penalty' . . . ." *Acceptance*, 71 S Cal L Rev at 1003 (citation omitted).

With regard to depraved-heart murder, the process was straightforward. Misadventure had long been an established defense to homicide. *Law of Homicide*, p 14. It provided a defense for many unintentional homicides. But Lord Coke established two

20

limitations on the defense, which had the effect of extending the murder offense to situations that would encompass depraved-heart murder. *Id*. at 14-15.[15] For the misadventure defense, the killing had to occur while the defendant was engaged in a lawful act and without evil intent. *Id*. at 14-15, 256; see also *Black's Law Dictionary* (11th ed) (defining "misadventure" as "[h]omicide committed accidentally by a person doing a lawful act and having no intent to injure"). Thus, Lord Coke explained, "If a man knowing that many people come in the street from a Sermon, throw a stone over a wall, intending only to fear them, or to give them a light hurt, and thereupon one is killed, this is murder[.]" Coke, The Third Part of the Institutes of the Laws of England (London: Rawlins, 1680), p 57. This was because "he had an ill intent, though that intent extended not to death, and though he knew not the party slain." *Id*.

Accordingly, "[s]ome killings that were not purposeful or knowing . . . were added to the murder category under the rubric of 'implied' malice, including a category of 'depraved heart' murders, and were treated the same as knowing killings." *Acceptance*, 71 S Cal L Rev at 1003 (citations omitted); see also Michaels, *"Rationales" of Criminal Law Then and Now: For a Judgmental Descriptivism*, 100 Colum L Rev 54, 75-76 (2000) ("Depraved heart murder was a residual category designed to capture reckless killings that were as deserving of punishment as intentional murders."); Snowden, *Second Degree Murder, Malice, and Manslaughter in Nebraska: New Juice for an Old Cup*, 76 Neb L Rev

---

[15] There were earlier cases that also helped lay the groundwork for the rise of implied malice. See Binder, *The Origins of American Felony Murder Rules*, 57 Stan L Rev 59, 76-80 (2004); *Second Degree Murder, Malice, and Manslaughter in Nebraska*, 76 Neb L Rev at 407-408.

399, 407-408 (1997) (noting that the category of implied malice "fit[] the older types of murders (that were not premeditated) under the 'with malice aforethought' requirement" and that this reflected the moral sentiments of the courts).  This was the common law that was received by the United States upon independence.  *Acceptance*, 71 S Cal L Rev at 1003; see generally Const 1963, art 3, § 7 ("The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed.").  This remained true even when in the eighteenth century some jurisdictions began dividing murder into degrees, and it was part of the common law incorporated into the law of the United States upon independence.  *Acceptance*, 71 S Cal L Rev at 1004 n 183.

The principle underlying this extension was that the malice necessary for depraved-heart murder was equivalent to that necessary for intent-to-kill murders.  After Coke's treatise, "[l]ater writers in texts and decisions state[d] that such an individual has a 'depraved mind and a heart devoid of social duty' and should be guilty of murder equally with the felon who kills intentionally."  *Law of Homicide*, p 15 (citation omitted).  In one notable treatise, Sir James Fitzjames Stephen similarly explained that "malice means nothing but wickedness . . . ."  3 Stephen, A History of the Criminal Law of England, p 56.  Thus, he noted, malice included "reckless indifference as to whether bodily injury was caused or not," because "[a]s far as wickedness goes it is difficult to suggest any distinction worth taking between an intention to inflict bodily injury, and reckless indifference whether it is inflicted or not."  *Id*. at 55-56.  Others concluded similarly, including the framers of the MPC, who stated that the MPC's analogous provision for reckless homicide "reflects the judgment that there is a kind of reckless homicide that cannot fairly be distinguished in

grading terms from homicides committed purposely or knowingly." Model Penal Code, § 210.2, comment 4 (1980); see also *id.*, comment 2 ("It seems clear . . . that some 'depraved mind' murders can properly be regarded as exhibiting the same disregard for the value of human life as intentional homicide and hence as deserving the same serious sanctions."); Hawley, *The Criminal Law* (Detroit: Collector Publishing Co, 1896), p 139 ("[B]y implied malice is meant that evil and malignant purpose, or state of mind, which prompts the act resulting in death in a case where there is no evidence of express malice toward the deceased. . . . In truth, the distinction between express and implied malice is of little value, and is more likely to confuse the mind than to lead to a clearer understanding of the crime of murder.").[16]

Courts, including ours, have likewise adopted this logic. In discussing the differences between manslaughter and second-degree murder, we stated:

> It is not necessary in all cases that one held for murder must have intended to take the life of the person he slays by his wrongful act. It is not always necessary that he must have intended a personal injury to such person. But it is necessary that the intent with which he acted *shall be equivalent in legal character* to a criminal purpose aimed against life. [*Wellar v People*, 30 Mich 16, 19 (1874) (emphasis added).]

The highest court in Maryland similarly emphasized that the culpability involved in depraved-heart murder was as great as that involved in intentional murders:

> " 'It ["depraved heart" murder] is the form [of murder] that establishes that the wilful doing of a dangerous and reckless act with wanton indifference to the consequences and perils involved, is just as blameworthy, and just as

---

[16] In regard to the MPC, it is worth repeating that it allows the duress defense to *all* murders, perhaps reflecting the above comments that deny a meaningful difference between depraved-heart murder and intentional killings.

worthy of punishment, when the harmful result ensues, as is the express intent to kill itself. This highly blameworthy state of mind is not one of mere negligence. . . . It is not merely one even of gross criminal negligence. . . . It involves rather the deliberate perpetration of a knowingly dangerous act with reckless and wanton unconcern and indifference as to whether anyone is harmed or not. The common law treats such a state of mind as just as blameworthy, just as anti-social and, therefore, just as truly murderous as the specific intents to kill and to harm.' " [*Robinson v State*, 307 Md 738, 744-745; 517 A2d 94 (1986) (citation omitted).]

Cf. *Mayes v People*, 106 Ill 306, 313-314 (1883) ("[I]t was utterly immaterial whether plaintiff in error intended the glass should strike his wife, his mother-in-law, or his child, or whether he had any specific intent, but acted solely from general malicious recklessness, disregarding any and all consequences. It is sufficient that he manifested a reckless, murderous disposition,—in the language of the old books, 'A heart void of social duty, and fatally bent on mischief.' A strong man who will violently throw a tin quart measure at his daughter—a tender child—or a heavy beer glass in a direction that he must know will probably cause it to hit his wife, sufficiently manifests malice in general to render his act murderous when death is the consequence of it. He may have intended some other result, but he is responsible for the actual result.").

Malice, therefore, was a holistic concept that, although it could be classed as express or implied, was not subject to division into different degrees of culpability based on whether the killing was intentional or unintentional. Cf. 3 Holdsworth, A History of English Law, p 259 ("This expression 'malice aforethought' gradually comes to be the description of the worst form of felonious homicide; and, from the latter part of the fourteenth century, homicide of this kind comes to be known by the name of murder[.]"). One writer accordingly defined malice without regard to intent to kill, noting that such an intent is not implied by malice. Hughes, A Treatise on Criminal Law and Procedure, p 72

("[Malice] does not imply ill-will or hatred, but, on the other hand, is something more than mere criminal intent. It does not, however, imply deliberation, nor does it imply intent to kill."). At the most basic level, " 'malice in murder means knowledge of such circumstances that according to common experience there is a plain and strong likelihood that death will follow the contemplated act . . . .' " *Id.*, quoting *Commonwealth v Chance*, 174 Mass 245, 252; 54 NE 551 (1899). Accordingly, for centuries, malice was seen as "not so much malevolence to the individual in particular, as an evil design in general, the dictate of a wicked, depraved and malignant heart." Hughes, p 73.[17]

---

[17] See also 1 Michie, A Treatise on the Law of Homicide, § 11(2), pp 77-78 ("[M]alice as essential to the crime of murder has a more extended meaning, and is, or better say is characterized and manifested by, the intentional doing of a wrongful act towards another without legal excuse or justification, which may probably result in depriving such person of his life, and is not confined to an intention to take away the life of such person.") (citations omitted); 1 East at 214-215 ("[T]he sense of [the] word *malice* is not only confined to a particular ill-will to the deceased, but is intended to denote, as Mr. Justice Foster expresses it, an action flowing from a wicked and corrupt motive, a thing done malo animo, where the act has been attended with such circumstances as carry in them the plain indications of an heart regardless of social duty and fatally bent upon mischief."); *A Report of Some Proceedings*, p 256 ("When the law maketh use of the term *malice aforethought* as descriptive of the crime of murder, it is not to be understood in that narrow restrained sense to which the modern use of the word *malice* is apt to lead one, *a principle of malevolence to particulars*. For the law by the term *malice* in this instance meaneth that the fact hath been attended with such circumstances as are the ordinary symptoms of a wicked, depraved, malignant spirit.") (capitalization altered); cf. 4 Blackstone, Commentaries on the Laws of England, p *197 ("If a man . . . does such an act, of which the probable consequence may be, and eventually is, death; such killing may be murder, although no stroke be struck by himself, and no killing may be primarily intended[.]").

Even those who have suggested that the concept of malice has shifted from "an underlying evil motive" to a "specific immediate intent" nonetheless recognize that malice extends to the intent "not to kill or even to injure, but to do some act with cause to know that it unwarrantably endangers human life . . . ." Sayre, *Mens Rea*, 45 Harv L Rev 974, 1019 n 184 (1932).

Under this reasoning, the presence of malice was seen as precluding any legal excuse, of which duress is an example. See *People v Luther*, 394 Mich 619, 622; 232 NW2d 184 (1975) (explaining that "[a] successful duress defense excuses the defendant from criminal responsibility"). One treatise quoted a 1484 decision in which the court stated that " 'in the legal acceptation it [i.e., malice] imports a wickedness which includes a circumstance attending an act that cuts off all excuse.' " 3 Stephen at 72 (citation omitted). Caselaw from this state has similarly linked implied malice—such as that under depraved-heart murder—to an intent to kill and explained that such malice is not susceptible to legal excuses. In *People v Potter*, 5 Mich 1, 9 (1858), we stated:

> But, malice aforethought is as much an essential ingredient of murder in the second degree, as in that of the first. Without this, the killing would be only manslaughter, if criminal at all. Now, malice aforethought is either express or implied, and there can be no case of murder in the first degree, except when committed in the perpetration, or attempt to perpetrate, arson, rape, robbery, burglary, . . . when there does not exist *express* malice; while, in case of murder in the second degree, the malice is generally, if not universally, *implied*.

As the Court of Appeals has observed of this reasoning, first-degree murder usually requires an actual intent to kill, "while in second-degree murder [which includes depraved-heart murder] frequently there is no actual intent to kill and, therefore, generally, if not universally, the intent to kill is implied." *People v Morrin*, 31 Mich App 301, 327 n 39; 187 NW2d 434 (1971), citing *Potter*, 5 Mich at 9.

The function of this malice, as noted above, is to preclude legal excuses. The Court of Appeals has stated that " '[m]alice aforethought is the intention to kill, actual or implied, under circumstances which do not constitute excuse or justification or mitigate the degree of the offense to manslaughter.' " *People v Goodard*, 82 Mich App 424, 430; 266 NW2d

26

832 (1978), quoting *Morrin*, 31 Mich App at 310-311. Thus, the malice necessary for depraved-heart murder prevents the resort to the duress defense. This conclusion reflects the historical understanding of implied malice, which has always been considered equivalent to express malice and which is not subject to the duress defense.[18]

4

The inclusion of unintentional killings in the category of murder reflects common moral intuitions and helps explain why depraved-heart murder is distinct from felony murder in respect to the duress defense. One scholar has explained that "there is no reason why unintentional killings, specifically depraved-heart killings, should inevitably be considered less culpable than, or only as culpable as, intentional ones." Dressler, *Rethinking Criminal Homicide Statutes: Giving Juries More Discretion*, 47 Texas Tech L Rev 89, 97 (2014) (emphasis omitted). "Critically," he stated, "our generally shared moral intuition is that someone who demonstrates, by his homicidal act, 'wickedness, evil or

---

[18] It is true, of course, that our statutes have separated murder into first and second degrees, with depraved-heart murder falling within the latter category. But this division, originally arising from Pennsylvania in the 1790s, reflected the fact that murder was punishable by death. See *Potter*, 5 Mich at 6-7. The distinction was drawn to separate punishments, not the basic definition of murder. *Id*. at 7 (" 'No objection was taken to the common law distinctions [of the types of crimes that all fell within the category of murder]. The general feeling was, that it was proper that they should remain. The question was one of *punishment*, not of *definition*.' ") (citation omitted); see also *Nye v People*, 35 Mich 16, 19 (1876) ("In dividing murder into degrees, its common-law qualities are not changed, but (except in special cases) the division is chiefly between cases where the malice aforethought is deliberate and where it is not."). Thus, the division of murder into different degrees stems from the sentiment that some types of murder are deserving of greater punishment. It does not indicate that the underlying malice of second-degree murder is of a different nature, such that it would be susceptible to the duress defense.

inhumanity,' or whose conduct is 'wanton [and] deficient in a moral sense of concern' for others, not only should be convicted of murder, but deserves to be treated as more culpable than some, perhaps many, intentional killers." *Id*. at 96 (citation omitted; alteration in original). As an example, consider two killings, one in which, on a whim, a person throws a child off a bridge, and another in which a son "carefully plans the mercy death of his ailing, pain-ridden, terminally ill father." *Id*. at 93. The latter killing is planned and premeditated, whereas in the former, the defendant might not specifically intend any harm. Yet, "one can easily understand how a jury, if permitted to do so, could find the merciful son less culpable than the baby killer." *Id*. at 97.

This line of reasoning further serves to distinguish depraved-heart murder from felony murder, which we addressed in *Reichard*. As noted above, under MCL 750.316(1)(b), felony murder occurs when a murder is "committed in the perpetration of, or attempt to perpetrate," various specified crimes, such as kidnapping, torture, a major controlled substance offense, and unlawful imprisonment. This Court has observed that felony murder can cover "an accidental killing occurring during the perpetration of a felony," which involves less culpability than second-degree murder or even an involuntary manslaughter. *People v Aaron*, 409 Mich 672, 708-709; 299 NW2d 304 (1980). A leading treatise, similarly, has noted that "the risk of death may be much less for felony murder than is required for depraved-heart murder . . . ." 2 LaFave, § 14.5(e). Indeed, " ' "[t]he felony-murder rule applies whether a felon kills the victim intentionally, recklessly, negligently, or accidentally and unforeseeably." ' " Binder, *The Origins of American Felony Murder Rules*, 57 Stan L Rev 59, 61 (2004) (citations omitted). In this regard, it is noteworthy that felony murder exists in this state by virtue of statute, this Court having

28

abolished common-law felony murder because we found "that the malice necessary for a felony-murder conviction cannot be inferred from the intent to commit the underlying felony alone." *People v Dumas*, 454 Mich 390, 397-398; 563 NW2d 31 (1997). As a result, it makes sense that duress could apply to felony murder but not to depraved-heart murder.

5

The last, thin rationale offered to support the result today is that the purpose of the duress defense is inapplicable to killings in which the defendant lacked an intent to kill. The majority supposes that, unlike with intentional murder, depraved-heart murder does not present the defendant with a choice to kill or be killed. Rather, it presents the defendant with the choice of creating the risk of killing someone or being killed. In other words, the depraved-heart-murder scenario only creates a probability of killing an innocent. The suggestion is that creating the risk of death is less blameworthy than intending to cause death.

The flaw in this argument is its underlying assumption that depraved-heart murder is materially distinct from intentional murder because the underlying conduct involves only the *risk* of death, whereas (presumably) the intentional murder presents the *certainty* of death. This is clearly wrong. Even the intentional-murder scenario is unavoidably probabilistic. Consider that, *ex ante*, the defendant cannot know with certainty whether his coercer will actually kill him or a loved one. It is only a probability. And, *ex ante*, even if

29

the defendant intends to kill the innocent third person, there is only a risk of death—the defendant might botch the job.[19]

In this respect, it is noteworthy that even when a coerced defendant fails to murder an intended target and is charged with attempted murder, the common law would not allow that defendant to use the duress defense. See *Annachamy v Holder*, 733 F3d 254, 260 n 6 (CA 9, 2013) (noting that the duress defense is not available in many jurisdictions for "attempted murder or aiding and abetting murder"), overruled on other grounds by *Abdisalan v Holder*, 774 F3d 517 (CA 9, 2015) (en banc); *Cawthon v State*, 382 So 2d 796, 797 (Fla App, 1980) (rejecting the duress defense in an attempted-murder charge and stating that the defense had never been available in Florida for such charges). As the Court of Appeals has stated, "Given that a defendant may not justify homicide with a claim of duress, it logically follows that a defendant cannot justify conduct intended to kill simply because he or she failed in the effort." *Henderson*, 306 Mich App at 7, overruled in part on other grounds by *Reichard*, 505 Mich at 89 n 18. The rule that duress is inapplicable to attempted murder demonstrates that the defense is inapplicable even when there is the mere risk of death, which is precisely the situation with depraved-heart murder. Further, to be charged with depraved-heart murder, someone must have actually died. Thus, while both forms of murder include aspects of risk and both result in death, the majority gives a

---

[19] The only possible difference between intentional and depraved-heart murder, then, is that arguably the risk of death to the innocent third person is marginally higher in the former than the latter. Perhaps someone who intends to kill is more likely to do so than someone who creates a high risk of killing. This is a difference, if at all, in degree rather than in kind. And it is not the sort of difference susceptible to drawing bright lines, as it involves rough estimates of unquantifiable intuitions.

windfall to the defendants who can demonstrate that they consciously disregarded the others' lives as opposed to possessing an intent to kill.

There is a further flaw in the majority's reasoning on this point. For the duress offense to apply, defendants themselves need not face the threat of death. Rather, duress applies when the coercion takes the form of the threat of death *or* serious bodily injury. *Reichard*, 505 Mich at 88. In light of the fact, as described above, that the defendant cannot know *ex ante* whether he would be killed or seriously harmed, the choice facing the defendant is the risk of death or serious bodily harm versus compliance with the coercer's demands. The majority's implicit lesser-evil reasoning—i.e., that the defendant's creation of the mere *risk* of killing another is a lesser evil than being killed—breaks down here. For example, under the majority's approach, defendants can invoke the duress defense when their conduct creates a "very high risk of death" even though they were threatened only with serious bodily harm. Defendants thus can choose what seems to be the greater evil and nonetheless invoke the defense.

### III

For the reasons discussed above, I disagree with the majority's conclusion in this case, which the majority only reaches by disregarding defendant's waiver of the issue in the lower court. The majority's conclusion rests on scraps of dicta from cases and sources that were not considering the issue presented here. The only courts that have addressed the matter have rejected the majority's approach. In doing so, those courts better reflect the history of depraved-heart murder. Though this form of murder does not require an intent to kill, the malice needed for a conviction has always been viewed as equivalent to such an

31

intent. And there is no other reason in law or logic to treat it differently for purposes of the duress defense. Certainly, the majority has not offered any such reasons. I therefore dissent.[20]

David F. Viviano
Brian K. Zahra

---

[20] Our order granting argument on the application also requested briefing on "whether the trial court erred in its instruction to the jury as to the intent element of second-degree murder[.]" *Gafken*, 508 Mich at 962. The majority does not address this issue, and neither would I. Defendant has raised in this Court, for the first time, arguments concerning whether the standard for malice is objective or subjective. As amicus, the Prosecuting Attorneys Association of Michigan, contends, we should not address this complicated and unresolved question when it was not preserved below. At the very least, additional briefing would be required.